In the

# United States Court of Appeals
## For the Seventh Circuit

---

No. 15-1366

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

RANDY JOHNSON,

*Defendant-Appellant.*

---

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 14-CR-25 — **Rudolph T. Randa**, *Judge.*

---

ARGUED NOVEMBER 30, 2016 — DECIDED OCTOBER 27, 2017

---

Before WOOD, *Chief Judge*, and FLAUM, EASTERBROOK, KANNE, ROVNER, WILLIAMS, SYKES, and HAMILTON, *Circuit Judges*.

EASTERBROOK, *Circuit Judge*. Police in Milwaukee saw a car stopped within 15 feet of a crosswalk, which is unlawful unless the car is "actually engaged in loading or unloading or in receiving or discharging passengers". Wis. Stat. §346.53. One police car drew up parallel to the stopped car, while another drew up behind. Shining lights through the

car's windows (it was after 7 P.M. in January), police saw a passenger in the back seat try to hide a firearm. Randy Johnson, the passenger, was prosecuted for possessing a weapon that, as a felon, he was forbidden to have. 18 U.S.C. §922(g)(1). After the district court denied his motion to suppress the gun, see 2014 U.S. Dist. LEXIS 135367 (E.D. Wis. Sept. 25, 2014), adopting 2014 U.S. Dist. LEXIS 135374 (E.D. Wis. Aug. 7, 2014), Johnson entered a conditional guilty plea and was sentenced to 46 months' imprisonment. A panel of this court affirmed the conviction, 823 F.3d 408 (7th Cir. 2016), but that decision was vacated when the full court decided to hear the appeal en banc.

Johnson concedes that the car was stopped 7 or 8 feet from a crosswalk. The district court held that this gave the police probable cause to issue a ticket, a process that entails a brief seizure of the car and its occupants. As Officer Conway approached he saw Johnson make movements that led him to infer that Johnson was hiding something such as alcohol, drugs, or a gun. Concerned for his safety, Conway ordered Johnson to get out of the car. See *Pennsylvania v. Mimms*, 434 U.S. 106 (1977) (officers making a traffic stop on probable cause may require a car's occupants to get out). Once the car's door was open, Conway saw a gun on the floor. This led to Johnson's arrest.

Johnson says that the judge should have suppressed the gun, because the statutory exception for receiving or discharging cargo or passengers means that the police did not have adequate reason to issue a ticket or even to approach the car until they had observed long enough to know that the car was not within the scope of the exception. The district court rejected that contention, as do we.

First, the district court found that, when the police approached, all four doors of the car were shut and no one was standing nearby, so that the exception was inapplicable. 2014 U.S. Dist. LEXIS 135374 at *6 ("there is simply no evidence that the SUV was engaged in loading or unloading, or in receiving or discharging passengers, as the doors to the vehicle were closed and there is no evidence that any individuals were in the immediate vicinity of the vehicle"). That finding is not clearly erroneous. Indeed, Johnson does not contest it.

Second, although Johnson contends that Wisconsin's judiciary would treat a driver's stop to buy something from a nearby store as within the "loading or unloading or … receiving or discharging passengers" exception, we need not address that issue of state law. Officers who had probable cause—recall that it has been stipulated that the car was within 15 feet of the crosswalk—were entitled to approach the car before resolving statutory exceptions. Police possessed of probable cause can hand out tickets (or make arrests) and leave to the judicial process the question whether a defense, exception, proviso, or other limitation applies. See, e.g., *Baker v. McCollan*, 443 U.S. 137, 145–46 (1979); *Hurem v. Tavares*, 793 F.3d 742, 745–46 (7th Cir. 2015); *Askew v. Chicago*, 440 F.3d 894, 896 (7th Cir. 2006). Parking-enforcement patrols approach stopped cars countless times every day. Depending on what they find, sometimes they write tickets and sometimes they don't. If the car is occupied, the difference may turn on what the driver says. The Fourth Amendment requires searches and seizures to be reasonable; it does not demand that police and other public officials resolve all possible exceptions before approaching a stopped car and asking the first question.

When denying Johnson's motion to suppress, the district court relied on *Whren v. United States*, 517 U.S. 806 (1996), which holds that probable cause to believe that a car's driver is engaged in speeding or another motor-vehicle violation supports a stop and arrest—and that the possibility of an ulterior motive, such as a desire to investigate drugs, does not matter, because analysis under the Fourth Amendment is objective. Johnson, who believes that the police had an ulterior motive for approaching his car, contends that *Whren* does not apply to infractions by stopped cars, which he labels parking violations rather than moving violations.

Yet *Whren* did not create a special rule for moving offenses. The two doctrines that underlie *Whren*'s holding—(1) that probable cause justifies stops and arrests, even for fine-only offenses, and (2) that analysis of search-and-seizure issues disregards the officers' thoughts—are of general application. See, e.g., *Los Angeles v. Mendez*, 137 S. Ct. 1539, 1546–47 (2017) (collecting cases); *Arkansas v. Sullivan*, 532 U.S. 769, 771 (2001); *Atwater v. Lago Vista*, 532 U.S. 318 (2001).

We assumed in *United States v. Shields*, 789 F.3d 733, 744–46 (7th Cir. 2015), that *Whren* applies to parked as well as moving vehicles, and to parking violations as well as moving violations. Every other circuit that has addressed the issue expressly has so held. See *Flores v. Palacios*, 381 F.3d 391, 402–03 (5th Cir. 2004); *United States v. Copeland*, 321 F.3d 582, 594 (6th Cir. 2003); *United States v. Choudhry*, 461 F.3d 1097, 1101 (9th Cir. 2006) (collecting cases). If there were to be a difference, it would be easier to deem "reasonable" (the constitutional standard) an officer's approach to a car already stopped than the halting of a car in motion. "[I]f police may pull over a vehicle if there is probable cause that a civil traf-

fic violation has been committed, then [the police] surely did not violate the Fourth Amendment by walking up to [a suspect], who was sitting in a car that rested in a spot where it was violating one of [a city's] parking regulations." *United States v. Thornton*, 197 F.3d 241, 248 (7th Cir. 1999).

*United States v. Paniagua-Garcia*, 813 F.3d 1013 (7th Cir. 2016), and *United States v. Flores*, 798 F.3d 645 (7th Cir. 2015), do not hold otherwise. Both of these decisions concern the circumstances under which moving vehicles may be stopped on reasonable suspicion. Cf. *Terry v. Ohio*, 392 U.S. 1 (1968). The stop of a moving vehicle is more intrusive than approaching a parked car. Because the police approached Johnson's car with probable cause to believe that the driver was violating a traffic law, and the car was not moving, it is unnecessary to consider today how *Terry* applies when cars are in motion. It is enough to conclude that *Whren* applies to both parking and moving offenses.

We grant that the police did more than just stroll up: two squad cars, which bathed the parked car in bright light, implied that the occupants were not free to drive away. The district judge treated this as a seizure; so do we. But issuing a ticket always entails a brief seizure. Johnson concedes that the driver of a car approached with probable cause to investigate a parking offense is not entitled to leave. What is more, when the officers approached this parked car, no one was in the driver's seat. (The driver was inside a liquor store making a purchase.) So both as a matter of the suspects' legal entitlements and as a matter of brute fact, it did not make any difference whether the police approached with two cars rather than one, or whether the cars' spotlights were on. Johnson's car was not going anywhere.

The district court concluded that the way in which the stop was conducted was not responsible for the gun's discovery. 2014 U.S. Dist. LEXIS 135374 at *13–16. That finding is not clearly erroneous. We therefore do not consider whether the officers' show of force was excessive under the circumstances. The United States contends that the use of two cars and searchlights was reasonable to reduce the risk the officers faced in making a nighttime stop in a high-crime area, circumstances in which a city will not rely on foot patrols to enforce traffic laws. Cf. *Arizona v. Johnson*, 555 U.S. 323 (2009) (discussing steps that officers may take for self-protection during auto stops). The district court did not address that subject; we do not either.

Finally, it is worth noting that Johnson has never contended that the police considered the race of the car's occupants when deciding to approach it, or when deciding to use two cruisers rather than one. Indeed, Johnson has not contended that the police even observed the race of the car's occupants until after they approached it; recall that Johnson's principal contention is that police had the car in view for only an instant before deciding to approach. We therefore do not consider whether, and if so when, using racial criteria to select among potential targets of investigation would require the suppression of evidence.

AFFIRMED

HAMILTON, *Circuit Judge*, joined by ROVNER and WILLIAMS, *Circuit Judges*, dissenting. Five officers in two police cars seized the passengers of a stopped car. The officers swooped in on the car, suddenly parking close beside and behind it with bright lights shining in from both directions, opening the doors, pulling all the passengers out and handcuffing them. The district court found, and the majority and I agree, that the passengers were seized as the officers swarmed them, *before* the officers had any sign that one passenger had a firearm. The sole basis for this intrusive and even terrifying "investigatory stop"? A suspected parking violation … for parking too close to an unmarked crosswalk.

The majority errs by extending *Terry v. Ohio*, 392 U.S. 1 (1968), and *Whren v. United States*, 517 U.S. 806 (1996), to allow this pretextual seizure based on the suspected parking violation. This extension is not supported by existing law. It also runs contrary to the core Fourth Amendment standard of reasonableness. No other appellate court has tolerated such police tactics to address a suspected parking violation. Nor should we, at least absent extraordinary circumstances not present here. We should find a Fourth Amendment violation in this seizure of the passengers in the car idling outside a store.

As applied to moving traffic violations, Fourth Amendment doctrine has evolved in recent decades to give police officers so much discretion, including the power to conduct pretextual traffic stops, that some scholars have described this power as the "the twentieth-century version of the general warrant." Sarah A. Seo, *The New Public*, 125 Yale L.J. 1616, 1669 (2016); see also Barbara C. Salken, *The General Warrant of the Twentieth Century? A Fourth Amendment Solution to Unchecked*

*Discretion to Arrest for Traffic Offenses*, 62 Temp. L. Rev. 221 (1989) (written before the most dramatic expansions of this discretion). The doctrinal evolution has enabled stops for what is often called "driving while black." See generally, e.g., David A. Harris, *"Driving While Black" and All Other Traffic Offenses: The Supreme Court and Pretextual Traffic Stops*, 87 J. Crim. L. & Criminology 544 (1997). Unless the target of such a seizure can offer evidence of racial motivation in the particular case, which is rarely available, such seizures are difficult to limit.

By extending *Terry* and *Whren* to the suspected parking violation in this case, the majority errs by taking the further step of enabling seizures that can be used for "parking while black." The majority's extension of doctrine is arguably defensible. But defensible does not mean correct. Cf. *City of Indianapolis v. Edmond*, 531 U.S. 32, 41–42 (2000) (drawing line to block drug checkpoints in city, despite arguable support for practice in Supreme Court precedents, "to prevent such intrusions from becoming a routine part of American life"). The police tactics here would never be tolerated in more affluent neighborhoods. This extension will further erode the Fourth Amendment, trading away privacy rights of some for the hope of more security for others, and stripping those targeted in searches of both security and privacy. We should find that the tactics in this case violated the Fourth Amendment. I respectfully dissent.

## I

The Fourth Amendment provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated … ." "This inestimable right of personal security belongs

as much to the citizen on the streets of our cities as to the homeowner closeted in his study to dispose of his secret affairs." *Terry v. Ohio*, 392 U.S. 1, 8–9 (1968). In *Terry*, the Supreme Court struck a practical and necessary balance between protecting privacy and allowing effective law enforcement. *Id.* at 20–21. *Terry* did so by allowing a brief investigatory stop in response to signs of an imminent armed robbery.

In applying *Terry*, "which is grounded in the standard of reasonableness embodied in the Fourth Amendment," the court "balances the nature and quality of the intrusion on personal security against the importance of the governmental interests alleged to justify the intrusion." *United States v. Hensley*, 469 U.S. 221, 228 (1985); see also 4 Wayne R. LaFave, Search and Seizure § 9.2(c) (5th ed. 2012) ("The *Terry* rule should be expressly limited to investigation of serious offenses."). When the governmental interest is based on a car parked too close to a crosswalk, the balance looks very different from the balance in *Terry*. The alleged governmental interests pale in comparison to the intrusion on personal security in this seizure.

Before digging into the doctrinal issues, consider the circumstances of this seizure. It was just after 7:30 p.m. on January 8, 2014 in Milwaukee. It was dark and very cold, during the memorable "Polar Vortex" of that winter. The air temperature was eight degrees Fahrenheit, with a wind-chill of twenty degrees below zero and eight inches of snow on the ground. The streets were quiet.

In a tough neighborhood in Milwaukee, five police officers were patrolling together in two squad cars. They were part of the Milwaukee Police Department's Neighborhood Task Force Street Crimes Unit assigned to patrol so-called "hot spots." As

one officer testified, "part of our initiative is to look for smaller infractions and hope that possibly they may lead to bigger and better things," posing the danger of police over-reach that was realized here.

In this search for "bigger and better things," the officers saw a car parked on a side street in front of a liquor store. The motor was running. The officer in charge saw an opportunity. The car was within fifteen feet of a crosswalk. That meant it *might* have been parked illegally.

The officer in charge made a split-second decision. The po-lice cars quickly turned onto the side street and closed in on the parked car—one police car pulled up next to and a little in front of the parked car, and the other pulled up right behind it. From both directions, the police lit up the parked car with headlights and spotlights. The five officers got out of their cars and immediately opened the doors of the parked car, shined a flashlight at the passengers, and ordered the passen-gers out of the car and handcuffed them. One, defendant Johnson, was unlawfully in possession of a firearm that he had placed on the floor of the car.

The district court found, and the majority agrees, that the car's passengers were seized the moment the police cars pulled up next to and behind the parked car. From that mo-ment, the passengers could not have felt free to walk away.

## II

This was not a reasonable seizure. It cannot be justified as the constitutional equivalent of an officer strolling up to a parked car to see if the driver or passengers are willing to chat. The passengers in the car were seized, and in a sudden,

terrifying, and unjustified way. Absent the most extraordinary circumstances, these intrusions on privacy and restraints on liberty—by police officers looking for "bigger and better things"—simply are not justifiable to write a parking ticket. And the government has not argued for any other ground to justify this seizure.

There are two distinct grounds for reversal here. The first is that the doctrines allowing pretextual traffic stops under the combination of *Terry* and *Whren v. United States*, 517 U.S. 806 (1996), should not be extended to mere parking violations. The second and narrower ground is that even if such an extension might be available in theory, the police did not have a reasonable basis for this particular seizure.

On the first ground for reversal, the Supreme Court itself has not gone so far as to allow seizure of a person to investigate a possible parking violation. The core Fourth Amendment standard of reasonableness is what drove the balance between privacy and law enforcement in *Terry*. 392 U.S. at 20–21; see also *United States v. Hensley*, 469 U.S. 221, 228 (1985) (balancing governmental interest against intrusion on personal security). Extending *Terry* and *Whren* to allow police to use a mere parking violation as a pretext for seizing a car's passengers, and then using the occasion to remove them and handcuff them, loses sight of reasonableness and proportion.

*Terry* authorizes investigatory stops without a warrant when a police officer has a reasonable suspicion that a person is engaged or is about to engage in crime. The logic of *Terry* has been understood to authorize traffic stops for moving violations. E.g., *Pennsylvania v. Mimms*, 434 U.S. 106, 109 (1977) ("no question about the propriety" of stop because car had expired tags); see also *Rodriguez v. United States*, 575 U.S. —,

—, 135 S. Ct. 1609, 1614 (2015) (routine traffic stop more anal-
ogous to *Terry* stop than to formal arrest). Since *Whren*, Fourth
Amendment law allows the police to carry out intrusive traf-
fic stops based on the pretext of investigating a moving traffic
violation.

This combination of constitutional decisions already ena-
bles a host of aggressive and intrusive police tactics. Police of-
ficers are trained to exploit those powers, as the officers tried
to do here in their search for "bigger and better things." Of-
ficers who have probable cause for a trivial traffic violation
can stop the car under *Whren* and then order all occupants out
of the car, *Maryland v. Wilson*, 519 U.S. 408 (1997), often frisk
them, *Arizona v. Johnson*, 555 U.S. 323 (2009), question them in
an intimidating way, visually inspect the interior of the car,
*Colorado v. Bannister*, 449 U.S. 1, 4 & n.3 (1980), often search at
least portions of the vehicle's interior, *Arizona v. Gant*, 556 U.S.
332 (2009); *Michigan v. Long*, 463 U.S. 1032 (1983), and hold the
driver and passengers while a drug-detection dog inspects
the vehicle, *Illinois v. Caballes*, 543 U.S. 405, 406–08 (2005).

In these encounters, the danger of further escalation is al-
ways present. With authority to stop comes the authority to
require the subject to submit to the stop, and to use reasonable
force in doing so. *Hensley*, 469 U.S. at 235; *Tom v. Voida*, 963
F.2d 952, 958 (7th Cir. 1992) (no violation where *Terry* stop led
to fatal shooting by police officer). The Fourth Amendment
also allows police to arrest suspects for minor traffic infrac-
tions even if a court could impose only a fine, *Atwater v. City
of Lago Vista*, 532 U.S. 318 (2001), and arrested persons can be
strip-searched, *Florence v. Board of Chosen Freeholders*, 566 U.S.
318, 339 (2012), fingerprinted, photographed, and per-
haps even subjected to a DNA test, see *Maryland v. King*, 569

U.S. —, —, 133 S. Ct. 1958, 1989 (2013) (Scalia, J., dissenting). Moreover, a *Terry* stop can even be justified by an officer's *mistake* of either law or fact. *Heien v. North Carolina*, 574 U.S. —, —, 135 S. Ct. 530, 536 (2014).

Adding these doctrines together gives the police broad discretion to impose severe intrusions on the privacy and freedom of civilians going about their business. This potential is not entirely new. In 1940, the future Justice Jackson said: "We know that no local police force can strictly enforce the traffic laws, or it would arrest half the driving population on any given morning." R. Jackson, The Federal Prosecutor, Address Delivered at the Second Annual Conference of United States Attorneys, April 1, 1940, quoted in *Morrison v. Olson*, 487 U.S. 654, 727–28 (1988) (Scalia, J., dissenting); see also, e.g., David A. Sklansky, *Traffic Stops, Minority Motorists, and the Future of the Fourth Amendment*, 1997 Sup. Ct. Rev. 271, 273 ("Since virtually everyone violates traffic laws at least occasionally, the upshot of these decisions is that police officers, if they are patient, can eventually pull over almost anyone they choose, order the driver and all passengers out of the car, and then ask for permission to search the vehicle without first making clear the detention is over.").

Courts usually examine these aspects of Fourth Amendment doctrine piecemeal, focusing on the one or two aspects most salient for the particular case. But when we consider a significant extension of Fourth Amendment authority, such as extending *Terry* and *Whren* to suspected parking violations, we must consider the cumulative effects of the doctrine. Those effects mean that authority to conduct an investigatory stop can trigger sweeping intrusions and even dangers. See Devon W. Carbado, *From Stopping Black People to Killing Black People:*

*The Fourth Amendment Pathways to Police Violence*, 105 Calif. L. Rev. 125 (2017) (reviewing cumulative effects); Gabriel J. Chin & Charles J. Vernon, *Reasonable but Unconstitutional: Racial Profiling and the Radical Objectivity of Whren v. United States*, 83 Geo. Wash. L. Rev. 882, 884 n.2 (2015) (collecting literature on consequences of *Whren*).

The government's theory here is that the suspected parking violation justified the seizure of the passengers. The government sees no difference between parking violations and suspected traffic violations, so that all the police tactics permitted in a pretextual traffic stop under *Whren* can be used when a car might be parked illegally.

Relevant case law is both sparse and divided, perhaps because the notion of using such aggressive police tactics in response to parking violations seems so audacious. As noted, the Supreme Court has not extended these powers to the parking context. It should not do so, particularly with an eye toward practical consequences, including whether the cumulative effects of Fourth Amendment doctrine are reasonable and whether such intrusions may become "a routine part of American life." *City of Indianapolis v. Edmond*, 531 U.S. 32, 42 (2000) (limiting "special needs" doctrine).

In *United States v. Thornton*, 197 F.3d 241 (7th Cir. 1999), two officers in a "high crime" neighborhood walked toward a car parked in a no-parking zone. They saw the driver get out of the car with what looked like a police-radio scanner. The officers patted down the driver and spotted what looked like a package of cocaine on the floor of the back seat. We said that whether "an illegally parked car, a crime-ridden neighborhood, the driver's sudden exit, and the driver's possession of a device that was monitoring police radio traffic adds up to

sufficient suspicion to justify a *Terry* stop is a close call." *Id*. at 248. In this case, by contrast, the police had much less to go on than the police had with that "close call" in *Thornton*. And the police tactics here were much more intrusive than walking up to the car, as in *Thornton*.

In *United States v. Shields*, 789 F.3d 733 (7th Cir. 2015), the panel treated a parking violation as enough to support an investigatory *Terry* stop, though the real action in *Shields* concerned the driver's decision to flee from the officers. The panel supported that extension of *Terry* to a parking citation by citing *United States v. Choudhry*, 461 F.3d 1097, 1103–04 (9th Cir. 2006) (allowing investigatory stop of vehicle in no-stopping/tow-away zone), which cited in turn *United States v. Copeland*, 321 F.3d 582, 594 (6th Cir. 2003) (allowing stop based on parking violation). 789 F.3d at 745.

These extensions of *Terry* to suspected parking violations remain few in number and are mistaken when there is no additional basis for the seizure. And at least two state supreme courts have taken a different view of the Fourth Amendment. See *State v. Duncan*, 43 P.3d 513, 517 (Wash. 2002) (*Terry* did not extend to seizure to investigate suspected civil infractions such as possession of open container of alcohol in public); *State v. Holmes*, 569 N.W.2d 181, 184–86 (Minn. 1997) (*Terry* did not authorize seizure to investigate suspected parking violation). An illegally parked car is a far cry from the would-be robbers casing their target in *Terry v. Ohio*.[1]

---

[1] Where a parking violation may, under the circumstances, signal a threat to security or safety, the Fourth Amendment does not and should not prevent reasonable responses by law enforcement to protect safety or security. Consider, for example, a van stopped illegally beside a federal office

Extending *Terry* stops and the further intrusions they entail to pretextual parking violations loses sight of the core test of reasonableness and the balance at the core of *Terry* and the Fourth Amendment itself. "The makers of our Constitution … conferred, as against the Government, the right to be let alone—the most comprehensive of rights and the right most valued by civilized men. To protect that right, every unjustifiable intrusion by the Government upon the privacy of the individual, whatever the means employed, must be deemed a violation of the Fourth Amendment." *Olmstead v. United States*, 277 U.S. 438, 478 (1928) (Brandeis, J., dissenting), overruled in relevant part, *Katz v. United States*, 389 U.S. 347, 353 (1967). We should find a violation of the Fourth Amendment in the unreasonable and intrusive seizure of the passengers in this case for the supposed purpose of investigating this parking violation.[2]

## III

Extending *Terry* and *Wren* to real parking violations is bad enough. The seizure here had even less foundation because the police did not have a reasonable basis for suspecting a parking violation. That is the second and narrower ground for reversal here.

---

building or a car idling in front of a street full of marching demonstrators. Those are not mere parking violations.

[2] The majority suggests that a seizure of an already-stopped car is less intrusive than a seizure of a moving car. I disagree. It is not less intrusive to seize a person sitting on a park bench than to seize a person walking past that park bench.

The police relied on a Wisconsin statute that provides:

> No person shall stop or leave any vehicle standing in any of the following places except temporarily for the purpose of and while actually engaged in loading or unloading or in receiving or discharging passengers and while the vehicle is attended by a licensed operator so that it may promptly be moved in case of an emergency or to avoid obstruction of traffic:
>
> (1)  In a loading zone.
>
> (2)  In an alley in a business district.
>
> (3)  Within 10 feet of a fire hydrant, unless a greater distance is indicated by an official traffic sign.
>
> (4)  Within 4 feet of the entrance to an alley or a private road or driveway.
>
> (5)  Closer than 15 feet to the near limits of a cross-walk.
>
> (6)  Upon any portion of a highway where and at the time when parking is prohibited, limited or restricted by official traffic signs.

Wis. Stat. § 346.53.

The seized car and passengers could stand lawfully where they were if the car was there "temporarily for the purpose of and while actually engaged in loading or unloading or in receiving or discharging passengers and while the vehicle is attended by a licensed operator." That was all the police saw

here: the driver had gone into a store, and the motor was running.

A car stopped in front of a store with its motor running is not itself suspicious. Given the sensible statutory proviso for cars that are loading and unloading, the police here could not reasonably decide, in the few seconds it took them to swoop in to seize this car and its passengers, that this seizure was justified.

Yet the majority treats what the police saw as suspicious enough to justify the seizure. That rationale overlooks the statute itself, which of course does not require the driver to "occupy" the car while loading or unloading. It requires only that the car be "attended" so it can be moved if needed. At the risk of stating the obvious, a driver making deliveries and pick-ups will not always occupy the vehicle, but he or she may "attend" it for these purposes.

To avoid the logic of the provision for loading and unloading, the majority cites cases from quite different contexts where police officers who receive conflicting information can make arrests and "leave to the judicial process the question whether a defense applies." Ante at 3, citing *Baker v. McCollan*, 443 U.S. 137, 145–46 (1979) (arrest based on mistaken identity), and other arrest cases, such as *Hurem v. Tavares*, 793 F.3d 742 (7th Cir. 2015) (trespass arrest of apartment tenant who could not produce copy of lease), and *Askew v. Chicago*, 440 F.3d 894 (7th Cir. 2006) (arrest for threat based on eyewitness accounts).

The majority's treatment of the loading-and-unloading proviso bears no practical relationship to reality or to what happened here on the streets of Milwaukee. Imagine that the

police tried these tactics in Milwaukee's affluent east side. Citizens would be up in arms, and rightly so. No police officer could expect to keep his job if he treated a car standing in front of a store as worthy of such an intrusive *Terry* stop. The government's theory—that the seizure of a stopped car by the police would be justified because the occupants could always explain *in court* that they had merely stopped the car to make a purchase—invites intolerable intrusions on people just going about their business.

We have rejected similar efforts to authorize stops on grounds that would apply to a high proportion of people engaged in lawful behavior. *United States v. Paniagua-Garcia*, 813 F.3d 1013, 1014–15 (7th Cir. 2016) (reversing denial of motion to suppress; police could not distinguish between driver's lawful and unlawful use of mobile telephone); *United States v. Flores*, 798 F.3d 645, 648–49 (7th Cir. 2015) (reversing denial of motion to suppress where police made traffic stop on unreasonable theory that would render illegal a "substantial amount" of lawful conduct).

What made the officers decide so fast to swoop in to seize this car? On this record, the only explanation is the neighborhood, and the correlation with race is obvious. It is true that Johnson has not made an issue of race, but we should not close our eyes to the fact that this seizure and these tactics would never be tolerated in other communities and neighborhoods. If we tolerate these heavy-handed tactics here, we enable tactics that breed anger and resentment, and perhaps worse, toward the police.

Defendant Johnson is not a sympathetic champion of the Fourth Amendment, of course. That is not unusual in Fourth

Amendment litigation. But the practical dangers of the majority's extension of *Terry* and *Whren* to suspected parking violations will sweep broadly. Who among us can say we have never overstayed a parking meter or parked a little too close to a crosswalk? We enforce the Fourth Amendment not for the sake of criminals but for the sake of everyone else who might be swept up by such intrusive and unjustified police tactics. I respectfully dissent.