NONPRECEDENTIAL DISPOSITION

To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued October 6, 2020
Decided November 3, 2020

**Before**

DIANE P. WOOD, *Circuit Judge*

MICHAEL B. BRENNAN, *Circuit Judge*

MICHAEL Y. SCUDDER, *Circuit Judge*

No. 19-3364

| | |
|---|---|
| UNITED STATES OF AMERICA, *Plaintiff-Appellee*, | Appeal from the United States District Court for the Northern District of Illinois, Eastern Division. |
| *v.* | No. 1:18-CR-00664(1) |
| MICHAEL THOMPKINS, *Defendant-Appellant*. | Virginia M. Kendall, *Judge*. |

**O R D E R**

About five minutes after a City of Chicago police officer pulled Michael Thompkins over for a traffic violation, the officer asked him to step out of his vehicle. After lengthy and at times heated discussions among Thompkins and a number of Chicago police personnel, Thompkins left his van, and the officer saw that Thompkins had been sitting on a gun. Later indicted for possessing a firearm as a felon in violation of 18 U.S.C. § 922(g)(1), Thompkins moved to suppress the gun, arguing that the order to leave the vehicle was unjustified. After the district court held an evidentiary hearing it denied Thompkins's motion. He then pleaded guilty to the offense but preserved the suppression issue for appeal. Because the order to leave the car was compatible with the

Fourth Amendment, and the district court correctly resolved the motion to suppress, we affirm.

**I.**

Officers Roger Farias and Sam Broderick were patrolling the Englewood neighborhood of Chicago in April 2018. While driving down a one-way street against the flow of traffic, they passed Thompkins's van, which had parked briefly, and they saw an obstruction in the van's front windshield. As Farias made a U-turn, he observed Thompkins pull out of his parked spot without signaling. Farias decided to pull Thompkins over.

The events of this traffic stop are depicted in dashboard and body-camera recordings and described in testimony at the suppression hearing. From the outset, Farias testified, Thompkins concealed the lower half of his body, was "nervous," and sat "very close" to the steering wheel. Farias asked Thompkins for his license and registration. Farias testified that, after Thompkins supplied this paperwork, he asked if Thompkins had guns or drugs. Farias also stated that, after the paperwork exchange, Thompkins lit a cigarette, but Farias's bodycam video seems to show that the smoking began before then. Farias then ran a database check on Thompkins (which took about four minutes) and learned that Thompkins had convictions for unlawful use of a weapon. When Farias asked Thompkins about his previous weapons convictions, Thompkins described them as "old" to which Farias replied, "well, it's last year." Officer Farias did not return Thompkins's license and registration at that point; rather, he held onto them while asking Thompkins about his record.

About five minutes after the stop began Broderick noticed a baton in the front of Thompkins's van. When asked about it, Thompkins denied its presence. Farias then told Thompkins to "step out" of the car, stating, "I'm not going to give you tickets or anything like that. I just, I want to make sure you don't have any guns in the car, okay." Farias later testified that he had not actually decided to refrain from ticketing Thompkins; he wanted to de-escalate the situation and also needed to discuss ticketing with his partner, as was his practice. Thompkins refused, arguing, "Ain't nothing in here, man. I mean, everything legit both ways in and out, so." Thompkins told Farias he would leave the car only if a superior officer showed up. About six minutes later a superior officer showed up and after an involved discussion with Thompkins that superior officer also ordered Thompkins out of his van. Other Chicago police personnel joined in enforcing this order. When Thompkins left the van, Farias saw a gun that

Thompkins had been sitting on and recovered it. It was a loaded .40 caliber semi-automatic pistol, leading to his arrest.

After his indictment for possessing a firearm as a felon in violation of 18 U.S.C. § 922(g)(1), Thompkins moved to suppress the gun and any statements made after its seizure. After an evidentiary hearing the district court denied the motion, crediting the testimony of Farias and Broderick as "largely consistent" with the video evidence. The court ruled that the officers had a lawful basis for the traffic stop; that the stop was not unreasonably prolonged in light of the officers' reasonable safety concerns; that those concerns were evident at the outset; and that even if "the lawful purpose of the stop ended at the moment Officer Farias informed Thompkins that he would not be issuing any tickets," Farias nonetheless had "independent reasonable suspicion to extend the stop." Finally, the district court added, "to the extent that the traffic stop was extended at all, it was extended due to Thompkins['s] own refusal to comply with the officer's direction to get out of the car until a supervisor appeared on the scene." Later Thompkins pleaded guilty and was sentenced to 27 months' imprisonment and three years of supervised release.

## II.

On an appeal of a denial of a suppression motion, we review the district court's legal conclusions de novo and its factual findings for clear error. *United States v. Are*, 590 F.3d 499, 504 (7th Cir. 2009). Thompkins does not challenge the initial stop, which the district court ruled was justified by the failure to signal and an obstructed window. Rather, Thompkins contends the officers prolonged the stop without the requisite reasonable suspicion after they had finished its "traffic-related" purpose, which ended after the database check and Farias's statement that he was not going to issue a ticket. The government responds that, when Farias ordered Thompkins out of the car, he had not decided whether to issue a ticket, so the order was a reasonable safety measure during a brief traffic stop.

With Thompkins's concession that the initial stop was lawful, we assess the reasonableness of the "incremental intrusion resulting from the request to get out of the car." *Pennsylvania v. Mimms*, 434 U.S. 106, 109 (1977). *Mimms* holds that, because traffic stops expose officers to the risks of passing cars and unseen movements of the stopped driver, the "de minimis" intrusion of ordering the driver out of the car is generally justified. *Id.* at 109-11. The order is justified even if, as in *Mimms*, the officer has "no reason to suspect foul play from the particular driver at the time of the stop." *Id*. at 109.

*See also United States v. Johnson*, 874 F.3d 571, 572–73 (7th Cir. 2017); *United States v. Tinnie*, 629 F.3d 749, 751–52 (7th Cir. 2011). Likewise, officers may inquire into matters not directly related to the reason for the traffic stop, such as asking whether there are weapons in the vehicle. See *Arizona v. Johnson*, 555 U.S. 323, 333 (2009). But in *Rodriguez v. United States*, the Supreme Court warned that "a traffic stop can become unlawful if prolonged beyond the time reasonably required to complete th[e] mission of issuing a warning ticket," which typically involves a database check of the driver. 575 U.S. 348, 354–55 (2015) (internal quotation marks and citations omitted). If the stop is prolonged in a "detour" from its traffic-related mission, then the safety rationale for an order to leave the car dissipates, unless the order is justified by an independent rationale compatible with the Fourth Amendment. *Id.* at 356–57.

We conclude the district court reasonably ruled that Farias did not impermissibly extend the traffic stop when he ordered Thompkins out of the car. The court reasonably credited Farias's testimony that, despite his contrary statement to Thompkins, he had not yet completed his traffic-citation mission and was trying to de-escalate rising tensions. At that point, the investigation had lasted only about five minutes, Farias had only seconds earlier finished the database check, he had not yet consulted his partner about whether to issue a ticket, as was his practice, and he had not returned Thompkins's license and registration. Based on these factors, it was permissible to find that the traffic-related purpose was still legitimately ongoing. So this case falls within the rule of *Mimms,* where officer safety justifies ordering a driver from a car during a genuinely unconcluded investigation.

Thompkins contests the factual finding that, when Farias ordered him out of the car, Farias had not finished the traffic-citation mission of the stop. He does so by attacking the credibility of other aspects of Farias's testimony. Specifically, he argues that the video recording near the start of the traffic stop does not show, as Farias testified, that Thompkins was sitting "very close" to the steering wheel or that he started smoking only after Farias asked for his license and registration. But these arguments do not establish clear error; on the contrary, we commend Judge Kendall for her careful review of the record. First, these aspects of Farias's testimony are unrelated to his testimony about the unfinished investigation. Second, the arguments are weak: the video recording is not clear either way regarding Thompkins's posture, and Farias may have genuinely forgotten when Thompkins began smoking. Third, the twelve-minute delay between the order to leave the car and Thompkins's exit, which he calls

the unrelated "detour," occurred only because Thompkins refused to leave the car until Farias's superior arrived and then contested the supervisor's order to leave the vehicle.

AFFIRMED