# IN THE SUPREME COURT OF IOWA

No. 19–0267

Submitted October 15, 2020—Filed March 5, 2021

**STATE OF IOWA,**

Appellee,

vs.

**JASMAINE R. WARREN,**

Appellant.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Polk County, Scott D. Rosenberg, Judge.

The defendant seeks further review of a court of appeals decision affirming her conviction for driving while revoked. **DECISION OF COURT OF APPEALS AFFIRMED IN PART AND VACATED IN PART; DISTRICT COURT JUDGMENT AFFIRMED.**

Christensen, C.J., delivered the opinion of the court, in which McDonald, Oxley, and McDermott, JJ., joined. Mansfield, J., filed a special concurrence. Appel, J., filed a dissenting opinion. Waterman, J., took no part in the consideration or decision of the case.

Gina Messamer (argued) of Parrish Kruidenier Dunn Boles Gribble Gentry Brown & Bergmann L.L.P., Des Moines, for appellant.

Thomas J. Miller, Attorney General, Israel Kodiaga (argued), Assistant Attorney General, John P. Sarcone, County Attorney, and Kailyn M. Heston, Assistant County Attorney, for appellee.

**CHRISTENSEN, Chief Justice.**

Is it unconstitutional for an officer to enforce a parking violation after he observes a driver illegally park her vehicle, leaving the vehicle sticking out of the driveway and into the road? If the officer smells marijuana and observes signs of the driver's intoxication when he stops the driver to enforce the parking violation, is it unconstitutional for the officer to inquire about the driver's intoxication when the officer could have enforced the parking violation by placing a citation on the driver's window instead of stopping her? If the officer asks the defendant for her license while he's enforcing the parking violation and discovers the driver's license is revoked, is it unconstitutional to extend his stop to enforce that violation? Is there any legally meaningful distinction between a parking and a moving violation for *Terry* stop purposes? These are the questions we must answer in this case.

Following a seizure and arrest made under these circumstances, the State charged the defendant with operating while intoxicated (OWI) and driving while license revoked. The defendant chose a bench trial, and the district court convicted the defendant on both charges. On appeal, the court of appeals reversed her OWI conviction due to insufficient evidence and remanded it for a new trial because the district court did not specify which OWI theory its verdict rested upon when the evidence did not support each theory the State presented. However, it affirmed her driving while revoked conviction, rejecting the defendant's claim that trial counsel was ineffective for not seeking suppression of the evidence on the basis that she was subjected to an unconstitutional seizure. Specifically, the defendant argued parking violations should be treated differently from moving violations such that parking violations do not supply law

enforcement with reasonable suspicion or probable cause for a seizure. She also argued the officer impermissibly prolonged the seizure.

On further review, we vacate the part of the court of appeals decision reversing Warren's OWI conviction because substantial evidence supports the district court's verdict finding Warren guilty of OWI. However, we affirm the court of appeals decision that Warren's counsel was not ineffective in declining to seek suppression of the evidence on the basis that she was subjected to an unconstitutional seizure, as the officer had probable cause to seize the defendant based on his observation of her traffic violation. Thus, we answer the aforementioned questions as follows:

1. No.
2. No.
3. No.
4. Not under the circumstances before us.

## I. Background Facts and Proceedings.

Around 2:30 a.m. on May 4, 2018, Jasmaine Warren was operating a motor vehicle in Des Moines. Officer Jeremy Engle of the Des Moines Police Department was on routine traffic patrol when he observed Warren's vehicle turn southbound and begin to rapidly accelerate. Officer Engle followed the vehicle onto Corning Avenue, where Warren pulled into a driveway and parked illegally in a no-parking zone with the back end of her vehicle sticking out into the street. Warren had attempted to park her vehicle behind another vehicle in the driveway, but most of her vehicle could not fit in the driveway and part of it stuck out into the roadway.[1]

---

[1]In her brief, Warren claims her "vehicle was almost entirely parked in the driveway of the residence," although she concedes it blocked the sidewalk. It is unclear from the body camera footage that there is any sidewalk on that street, as the footage only shows grass leading to the curb in front of a fence in the area next to the driveway where Warren attempted to park. However, it is clear that most of Warren's vehicle was not parked in the driveway of the residence because, in the house next to the driveway,

Before Officer Engle could make contact with Warren, another police officer pulled in behind her and activated his overhead lights. Officer Engle followed suit to advise Warren she could not park her vehicle that way.

Officer Engle noted Warren "seemed like she wanted to . . . get inside quickly." He advised her she could not park the vehicle where she did and asked if she had her license, registration, and proof of insurance. As Warren opened her car door to retrieve the requested documents, Officer Engle "smelled a strong odor of marijuana emitting from her vehicle." He also noticed Warren had bloodshot, watery eyes and droopy eyelids, and he could smell marijuana and "a faint odor of alcohol" on Warren.

Warren provided Officer Engle with her identification, which declared it was "identification only," and she told him her license was suspended. She did not provide her registration and insurance. After receiving Warren's identification, Officer Engle asked Warren why the vehicle smelled like marijuana.[2] Warren responded, "Yeah, we smoke, that's all. Least I'm honest, shit," and laughed.

Officer Engle again asked Warren if she had her registration and insurance, and Warren opened the driver's side door of the vehicle to look for those documents. As she opened the door, she exclaimed, "Ooh, it is, it does smell like weed," to which Officer Engle responded, "Yeah, it does." Warren said, "Sorry!" and laughed. Warren eventually provided Officer Engle with a document she claimed was her registration that had an old

---

the fence enclosing the end of the front yard from the street aligns with Warren's front bumper. At a minimum, the back end of the vehicle protrudes into the street. Her vehicle blocks the view of part of another police officer's vehicle, which is parked along the curb perpendicular to Warren's vehicle. Warren's application for further review acknowledges that part of her vehicle was in the roadway, stating, "Ms. Warren pulled her vehicle halfway into a driveway—leaving the rear portion of the vehicle sticking out into the street . . . ."

[2] It is at this point in the encounter that Officer Engle's body camera begins capturing video footage, which was later admitted as evidence at Warren's trial.

address on it and told Officer Engle that she did not have her insurance with her.

Officer Engle went to his vehicle with Warren to verify her driving status through the National Crime Information Center on his dash computer. In the process, he explained to Warren that she could not "be driving and smoking weed." Warren clarified that she was not smoking and driving at the same time, as she had only smoked while at work and had just left work before driving. Officer Engle then discovered and informed Warren that her license was revoked, not suspended as she had claimed.

Warren became upset and defensive, asking Officer Engle if she had to go to jail. He questioned her about how long before the stop she had smoked marijuana or consumed alcohol. Warren said it was "hours ago, like hours, three, four" hours before driving that she had consumed alcohol. She provided varying time frames that included an hour and a half, an hour, and forty-five minutes prior to the stop regarding her marijuana use. Officer Engle asked Warren if she would participate in field sobriety testing, but Warren responded that she did not want to take any tests and instructed Officer Engle to take her to jail. He subsequently asked Warren if she would take a preliminary breath test, which Warren also refused.

Warren initially laughed when Officer Engle explained that she could not smoke marijuana and then operate a motor vehicle, but she quickly became more upset when Officer Engle informed her he was arresting her for operating while intoxicated (OWI) after she refused the field sobriety and preliminary breath testing. Officer Engle transported Warren to the police station, where he read her the appropriate implied consent notice and requested a urine specimen to check for drugs or alcohol. Warren

refused to provide a urine specimen, explaining she had Methadone in her system and "smoked more weed than [she drank] anything."

The State formally charged Warren by trial information with second-offense OWI, an aggravated misdemeanor, in violation of Iowa Code section 321J.2 (2018), and driving while license was revoked, a serious misdemeanor, in violation of Iowa Code section 321J.21.[3] The trial information did not specify which subsection of section 321J.2 Warren allegedly violated. Instead, the State presented two theories at trial—Warren operated a motor vehicle while either "under the influence of an alcoholic beverage or other drug, or a combination of such substances," or "while any amount of controlled substances is present in the person as measured in the person's blood or urine."

The case proceeded to a bench trial, and the district court found Warren guilty as charged on November 14, 2018. The district court's written findings regarding the OWI charge state,

> Based upon the entire review of the evidence presented, including State's Exhibit 1 [(Officer Engle's body camera footage)] and State's Exhibit 2 [(a certified abstract of Warren's driving record authored by the Department of Transportation)], and the admission of the Defendant during closing argument,[4] the Court finds that the Defendant is guilty beyond a reasonable doubt of operating a motor vehicle while intoxicated in violation of Iowa Code Section 321J.2. The Court finds credible Officer Engle's observations and opinion as to the impairment of Ms. Warren on May 4, 2018, which is further supported by the body camera footage in State's Exhibit 1.

The district court did not specifically state which OWI theory it found Warren guilty under in its ruling. For Warren's OWI conviction, the district

---

[3]She was separately charged in simple misdemeanor cases with the parking violation and failure to provide proof of financial liability.

[4]Regarding the OWI charge, Warren's counsel made no admission on her behalf. Counsel only agreed that Warren was operating her motor vehicle while her license was revoked and had illegally parked that vehicle.

court sentenced her to a two-year indeterminate term of incarceration and an $1875 fine. For the driving while revoked conviction, the district court sentenced Warren to a one-year term of incarceration to run concurrent with her OWI sentence and a fine of $1000.

Warren appealed, arguing there was insufficient evidence to sustain her OWI conviction and trial counsel was ineffective in failing to seek suppression of the evidence on the basis that she was subjected to an unconstitutional seizure. We transferred the case to the court of appeals, which reversed Warren's OWI conviction due to insufficient evidence and remanded the matter for a new trial because the district court did not specify which OWI theory its verdict rested upon when the evidence did not support each theory the State presented. The court of appeals affirmed Warren's conviction for driving while revoked, rejecting her ineffective-assistance claim. Warren sought further review, which we granted.

## II. Standard of Review.

We evaluate sufficiency-of-the-evidence claims for substantial evidence, upholding a verdict if substantial evidence supports it. *State v. Trane*, 934 N.W.2d 447, 455 (Iowa 2019). "Evidence is substantial if it would convince a rational trier of fact the defendant is guilty beyond a reasonable doubt." *State v. Folkers*, 941 N.W.2d 337, 338 (Iowa 2020) (quoting *State v. Hearn*, 797 N.W.2d 577, 579–80 (Iowa 2011)). We view "the evidence in the light most favorable to the verdict, including all legitimate inferences and presumptions that may fairly and reasonably be deduced from the evidence in the record." *Id.* "To the extent our review also requires us to interpret the meaning and scope of a particular statute, our review is for correction of errors at law." *State v. Anspach*, 627 N.W.2d 227, 231 (Iowa 2001) (en banc).

Further, claims of ineffective assistance are grounded in the Sixth Amendment of the United States Constitution and article I, section 10 of the Iowa Constitution. *State v. Ross*, 941 N.W.2d 341, 345 (Iowa 2020). Though Senate File 589, which took effect on July 1, 2019, eliminated the ability to pursue ineffective-assistance claims on direct appeal, we may still decide those ineffective-assistance claims on direct appeal in which the appeal was already pending on July 1, 2019, if "the record is adequate to warrant a ruling." *Id.*; *see also State v. Macke*, 933 N.W.2d 226, 231–32 (Iowa 2019) (explaining the scope of Senate File 589). Warren's notice of appeal was file-stamped February 14, 2019, so her challenge is properly before us on direct appeal. We review ineffective-assistance claims de novo. *State v. Brown*, 930 N.W.2d 840, 844 (Iowa 2019).

**III. Analysis.**

**A. The Sufficiency of the Evidence Supporting Warren's OWI Conviction.** Warren maintains the State's evidence was insufficient to establish she violated Iowa Code section 321J.2(1)(*c*) beyond a reasonable doubt because the State failed to provide any test results concerning the presence of a controlled substance in her blood or urine. Under section 321J.2(1), a person commits an OWI by operating a motor vehicle in any of the following conditions:

> *a.* While under the influence of an alcoholic beverage or other drug or a combination of such substances.
>
> *b.* While having an alcohol concentration of .08 or more.
>
> *c.* While any amount of a controlled substance is present in the person, as measured in the person's blood or urine.

"Each prong uses a different theory and primarily relies on different evidence." *State v. Myers*, 924 N.W.2d 823, 828 (Iowa 2019). While the first prong, section 321J.2(1)(*a*), "primarily utilizes evidence of a person's

conduct and demeanor," the other two prongs, sections 321J.2(1)(*b*) and (*c*), "require evidence derived from a test, not conduct." *Id.*

The State presented two theories of Warren's guilt for the OWI: that Warren operated a motor vehicle "[w]hile under the influence of an alcoholic beverage or other drug or a combination of such substances" under section 321J.2(1)(*a*) or "[w]hile any amount of a controlled substance [was] present in [her] person, as measured in the person's blood or urine" under section 321J.2(1)(*c*). Warren contends her conviction must be vacated because she was charged with alternative theories of committing the offense, there was insufficient evidence to support one of the theories, and the district court entered a general verdict. We disagree.

The cases upon which Warren relies relate to jury verdicts. In our general jury verdict cases, "we have emphasized that reversal is required because there was no way in which we could determine whether the jury's verdict was based upon the flawed jury instruction." *State v. Shorter*, 893 N.W.2d 65, 76 (Iowa 2017). The deficit in information regarding the basis for the jury's verdict precluded judicial review and required reversal and remand for new trial. *See State v. Tyler*, 873 N.W.2d 741, 753–54 (Iowa 2016) (explaining reversal was required because we had "no way of knowing" what theory the jury returned a guilty verdict (quoting *State v. Smith*, 739 N.W.2d 289, 295 (Iowa 2007))); *State v. Lathrop*, 781 N.W.2d 288, 297 (Iowa 2010) ("When circumstances make it impossible for the court to determine whether a verdict rests on a valid legal basis or on an alternative invalid basis, we give the defendant the benefit of the doubt and assume the verdict is based on the invalid ground."); *Smith*, 739 N.W.2d at 295 ("[W]e are still required to reverse these convictions and remand the case to the district court for a new trial on these charges, because the general verdict returned by the jury did not reveal the basis for its guilty

verdict."); *State v. Heemstra*, 721 N.W.2d 549, 558 (Iowa 2006), *superseded in part by statute*, 2011 Iowa Acts ch. 8, § 2 (codified at Iowa Code section 622.10(4)(*a*)(2) (2013)), *as recognized in State v. Leedom*, 938 N.W.2d 177, 190 (Iowa 2020) ("When a general verdict does not reveal the basis for a guilty verdict, reversal is required."); *State v. Pilcher*, 242 N.W.2d 348, 354–56 (Iowa 1976) (en banc) (holding reversal was required when general verdict did not specify the alternative upon which the jury based its verdict and one of the alternatives was unconstitutional).

There is no such deficit in information in bench trials, generally, and in this case, particularly. "[F]indings of fact in jury-waived cases shall have the effect of a special verdict." Iowa R. App. P. 6.907; *see State v. Fordyce*, 940 N.W.2d 419, 425 (Iowa 2020). "The district court's finding of guilt is binding upon us unless we find there was not substantial evidence in the record to support such a finding." *State v. Torres*, 495 N.W.2d 678, 681 (Iowa 1993) (en banc). Substantial evidence means "such evidence as could convince a rational trier of fact that the defendant is guilty beyond a reasonable doubt." *State v. Robinson*, 288 N.W.2d 337, 339 (Iowa 1980). In determining whether there was substantial evidence, we view the record evidence in the light most favorable to the State. *Id.* at 338.

When the evidence is viewed in the light most favorable to the State, the district court's finding of guilt is supported by substantial evidence. The district court found Warren was "guilty beyond a reasonable doubt of operating a motor vehicle while intoxicated." In support of that finding, the district court credited "Officer Engle's observations and opinion as to the impairment of Ms. Warren on May 4, 2018, which is further supported by the body camera footage in State's Exhibit 1." It was "Officer Engle's opinion that the behavior and the appearance of the Defendant indicated that she was using marijuana and that she was under the influence of that

drug and/or a combination of alcohol." It is clear from the district court's written findings and verdict the district court found Warren guilty of violating Iowa Code section 321J.2(1)(*a*). Officer Engle's opinion and the body camera footage is substantial evidence in support of the verdict actually rendered. *See Myers*, 924 N.W.2d at 831 (stating conduct and demeanor evidence and opinion evidence are sufficient to "support a conviction" for operating while intoxicated); *State v. Truesdell*, 679 N.W.2d 611, 616 (Iowa 2004) (finding witnesses' and police officers' reports regarding defendant's erratic driving and behavior supported a finding that he was under the influence of alcohol when he operated his vehicle).

It is a fundamental rule of Iowa law that an appellate court will not disturb the judgment of the district court where the record shows that the error cannot operate to the prejudice of the party attacking the judgment. This has been the law governing this jurisdiction since the first term of the territorial supreme court. *See Harrell v. Stringfield*, Morris 18, 19 (Iowa 1839) (holding defective jury verdict did not require reversal where the intent of the jury was clear and stating "we are determined not to disturb proceedings in [the trial] courts[] for technical errors which can work no possible harm"). It is still the law now. There is no prejudice here because we can determine the district court found the defendant guilty under a theory supported by sufficient evidence. Therefore, we affirm the district court's judgment on this issue.

**B. Warren's Ineffective-Assistance-of-Counsel Claim.** Warren claims her trial counsel was ineffective for failing to seek suppression of the evidence based on what she argues was an illegal seizure in violation of the Fourth Amendment of the United States Constitution and article I, section 8 of the Iowa Constitution. Iowa Code section 814.7, which eliminated the ability to pursue ineffective-assistance claims on direct appeal, does not

apply to Warren's appeal because her appeal was already pending before that section took effect on July 1, 2019. *See Macke*, 933 N.W.2d at 231– 32. We generally preserve claims of ineffective assistance for postconviction-relief proceedings to allow the parties "to develop an adequate record of the claims" and "the attorney charged with ineffective assistance with the 'opportunity to respond to defendant's claims.' " *State v. Harrison*, 914 N.W.2d 178, 206 (Iowa 2018) (quoting *State v. Soboroff*, 798 N.W.2d 1, 8 (Iowa 2011)). However, we may resolve ineffective-assistance claims on direct appeal if we determine the record is adequate to do so. *Id.* The State does not dispute the adequacy of the record to decide Warren's claim, and we find the record adequate to warrant a ruling.

To succeed on her ineffective-assistance claim, Warren "must prove (1) counsel failed to perform an essential duty and (2) prejudice resulted." *Brown*, 930 N.W.2d at 855. We presume counsel performed his or her duties competently and "measure counsel's performance against the standard of a reasonably competent practitioner." *Id.* (quoting *State v. Maxwell*, 743 N.W.2d 185, 195 (Iowa 2008)). Counsel need not predict changes to the existing law or raise issues that lack merit, but he or she must be reasonably diligent in determining which issues warrant raising. *Id.*

To show counsel failed to perform an essential duty, Warren must demonstrate her counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984). Prejudice occurs if "there is a reasonable probability that, but for the counsel's unprofessional errors, the result of the proceeding would have been different." *Brown*, 930 N.W.2d at 855 (quoting *State v. Wills*, 696 N.W.2d 20, 22 (Iowa 2005)). Accordingly, we

must examine the merits of Warren's argument that she was subjected to an unconstitutional seizure to determine whether her trial counsel was ineffective in declining to file a motion to suppress evidence stemming from that seizure.

Both the Fourth Amendment to the United States Constitution and article I, section 8 of the Iowa Constitution protect individuals from unreasonable searches and seizures. U.S. Const. amend. IV; Iowa Const. art. I, § 8. Evidence obtained in violation of either of these constitutional provisions is inadmissible. *State v. Christopher*, 757 N.W.2d 247, 249 (Iowa 2008). We ordinarily "interpret the scope and purpose of the Iowa Constitution's search and seizure provisions to track with federal interpretations of the Fourth Amendment" due to their nearly identical language, though we remain cognizant of our duty to independently interpret the Iowa Constitution. *Brown*, 930 N.W.2d at 847 (quoting *Christopher*, 757 N.W.2d at 249).

"When, as here, a defendant raises both federal and state constitutional claims, the court has discretion to consider either claim first or consider the claims simultaneously." *State v. Pals*, 805 N.W.2d 767, 772 (Iowa 2011). Warren argues the seizure violated her rights under the Federal and State Constitutions and emphasizes the need for Iowa's "defense attorneys [to] present arguments under the [S]tate [C]onstitution when the [F]ederal [C]onstitution does not adequately protect a client's rights." However, she does not actually ask us to depart from Fourth Amendment precedent to reach a different conclusion under article I, section 8, nor does she separately brief or analyze her state constitutional argument. Consequently, we will consider Warren's federal and state constitutional claims simultaneously, applying the federal standards as outlined by the United States Supreme Court governing the Fourth

Amendment. *See State v. Tyler*, 830 N.W.2d 288, 291–92 (Iowa 2013) ("Where a party raises both state and federal constitutional claims but does not argue that a standard independent of the federal approach should be employed under the state constitution, we ordinarily apply the substantive federal standards but reserve the right to apply the standard in a fashion different from federal precedent.").

The "[t]emporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of" the Fourth Amendment. *Whren v. United States*, 517 U.S. 806, 809–10, 116 S. Ct. 1769, 1772 (1996); *see also Pals*, 805 N.W.2d at 773. The State acknowledges Officer Engle seized Warren when he stopped to investigate Warren's traffic violation, but it insists it was a lawful seizure supported by probable cause because the officer witnessed Warren commit a parking violation.

Warren presents two theories as to why the seizure was unconstitutional. First, Warren argues the police had no reasonable suspicion or probable cause to stop and seize her because they had witnessed a completed parking violation rather than a moving violation. Warren maintains Officer Engle should have left a parking citation—presumably in the name of the vehicle's registered owner after running the vehicle's license plates—on the vehicle's windshield instead of seizing her. Second, Warren insists that even if the seizure was appropriate to issue the parking citation, Officer Engle unlawfully extended the traffic stop by requesting Warren's license, registration, and insurance information when he could have placed a written citation on her vehicle without the requested information instead.

1. *Probable cause and parking violations.*  Generally, police officers have probable cause to stop a motorist if they witness the motorist commit a traffic violation.  *Brown,* 930 N.W.2d at 855; *see also Whren,* 517 U.S. at 810, 116 S. Ct. at 1772 ("As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred.").  Here, Warren does not contest Officer Engle witnessed her commit a parking violation that constitutes a simple misdemeanor offense in violation of Iowa Code section 321.358.  That section provides, "No person shall stop, stand, or park a vehicle, except when necessary to avoid conflict with other traffic or in compliance with the directions of a police officer or traffic-control device, in" any one of the fifteen statutorily specified places, except under specified circumstances that are inapplicable here.  Iowa Code § 321.358.  Nonetheless, Warren asks us to distinguish between moving and parking violations for constitutional purposes, relying on "[c]ourts from other jurisdictions [that] have concluded parking violations do not supply reasonable suspicion or probable cause for a seizure" in her argument that "[t]he completed parking violation did not authorize Officer Engle to seize Ms. Warren and question her."

Despite asking us for a bright-line distinction between moving and parking violations in her brief, Warren changed course during her oral argument before our court.  Instead of arguing for the bright-line distinction between moving and parking violations advocated for in her brief, Warren declared instead "that this court can . . . carve out parking violations that create a safety risk" as a community-caretaking function while holding seizures for other parking violations are unconstitutional. We cannot address Warren's proffered community caretaking exception because we do not decide or consider arguments raised for the first time

during oral argument. *Dilley v. City of Des Moines*, 247 N.W.2d 187, 195 (Iowa 1976) (en banc).

It would be especially unfair to do so in this case because the State has the burden to prove the community caretaking exception to the warrant requirement, *see State v. Coffman*, 914 N.W.2d 240, 257–58 (Iowa 2018), and it had no reason to brief that argument on appeal. In addition to the absence of briefing, we cannot fairly address the community caretaking exception because this case is before us on an ineffective-assistance claim without the benefit of a motion to suppress hearing to illuminate Officer Engle's intent behind the seizure, which is fundamental to the community caretaking analysis. *See id.* Therefore, we are left only to rule on Warren's request for a bright-line distinction between moving violations and all parking violations. Based on the arguments before us, we cannot draw that line and save for another day the issue of whether there is a constitutional distinction between parking violations that pose a safety threat and nonthreatening parking violations.

Warren's argument that the seizure was unconstitutional because Officer Engle could have left a citation on her vehicle without seizing her conflates what Officer Engle *could* have done and what he *should* have done. There is no germane authority for Warren's requested constitutional distinction between moving and parking violations. In *Whren v. United States*, the United States Supreme Court held that a traffic stop was reasonable under the Fourth Amendment where the officers had probable cause to believe the petitioner violated civil traffic regulations. 517 U.S. at 810, 116 S. Ct. at 1772. *Whren* involved a moving violation, but nothing in the Supreme Court's opinion suggests its holding that "the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred" is limited to moving violations.

*Id.* On the contrary, the Supreme Court in *Whren* specifically rejected the argument that different types of traffic violations should be distinguished in justifying a traffic stop such that the "infraction itself can no longer be the ordinary measure of the lawfulness of enforcement." *Id.* at 818, 116 S. Ct. at 1777.

As the United States Court of Appeals for the Seventh Circuit reasoned in concluding *Whren* did not establish a special rule for moving violations,

> [I]f police may pull over a vehicle if there is probable cause that a civil traffic violation has been committed, then [the police] surely did not violate the Fourth Amendment by walking up to [a suspect], who was sitting in a car that rested in a spot where it was violating one of [a city's] parking regulations.

*United States v. Johnson*, 874 F.3d 571, 574 (7th Cir. 2017) (en banc) (alterations in original) (quoting *United States v. Thornton*, 197 F.3d 241, 248 (7th Cir. 1999)), *cert denied*, 139 S. Ct. 58 (2018). "The stop of a moving vehicle is more intrusive than approaching a parked car." *Id.*

Warren points to two state courts that have concluded parking violations do not supply reasonable suspicion or probable cause for a seizure, but these holdings represent outliers in the national caselaw on this issue. *See State v. Holmes*, 569 N.W.2d 181, 185 (Minn. 1997) (en banc); *State v. Medlar*, 638 N.E.2d 1105, 1109–10 (Ohio Ct. App. 1994); *but see State v. Eason*, 69 N.E.3d 1202, 1210 (Ohio Ct. App. 2016) (affirming the district court's denial of defendant's motion to suppress because an officer's observation of defendant's parking violation "served as a lawful basis to stop the vehicle"). They are also factually distinguishable from the circumstances in this case. For example, in *State v. Holmes*, which Warren cites, the Minnesota Supreme Court determined reasonable suspicion of a parking violation did not justify the seizure of a

defendant *after* a parking monitor "already had *enforced*" the parking violation "by issuing [a] ticket and ordering [a] tow" before the police officer even arrived on the scene. 569 N.W.2d at 185. Meanwhile, this case involves an officer approaching and temporarily seizing Warren to enforce the parking violation in the first instance as opposed to the already enforced violation in *Holmes*.

In contrast to the two cases Warren cites, every federal court of appeals that has considered this issue has held that a parking violation, even if punishable only as a civil infraction, is a traffic violation that constitutes probable cause to stop the motorist. *See Johnson*, 874 F.3d at 573–74 (7th Cir. 2017) (concluding there is no "special rule" distinguishing moving and parking violations and upholding the officer's seizure of the defendant after witnessing the defendant park illegally); *United States v. Choudhry*, 461 F.3d 1097, 1101–04 (9th Cir. 2006) (holding an officer's observation of a parking violation under California's civil-administrative enforcement provided reasonable suspicion for the officer to seize the vehicle's occupants), *cert. denied*, 549 U.S. 1236 (2007); *Flores v. City of Palacios*, 381 F.3d 391, 402–03, 403 n.9 (5th Cir. 2004) (holding the officer had authority to detain the defendant after observing her park on the wrong side of a two-way street in violation of state law); *United States v. Copeland*, 321 F.3d 582, 594 (6th Cir. 2002) ("[A]n officer can effect a stop based upon a driver's failure to comply with Michigan's parking regulations . . . ."); *see also United States v. Spinner*, 475 F.3d 356, 358 (D.C. Cir. 2007) (acknowledging federal circuits "have found no legally meaningful distinction between a parking and a moving violation" for *Terry* stop purposes, but finding it unnecessary to address the issue). To illustrate, in *United States v. Choudhry*, the Ninth Circuit affirmed the district court's denial of a motion to suppress evidence obtained during

law enforcement's investigatory traffic stop of a vehicle to enforce a parking violation in California. 461 F.3d at 1101. There, police officers observed a vehicle parked illegally and saw the vehicle's occupants make "hurried movements" that led the officers to believe the occupants were engaging in possibly illegal activity. *Id.* at 1098–99. Consequently, the officers turned on their emergency vehicle lights and seized the occupants for investigatory purposes. *Id.*

During the seizure, one officer questioned the driver while another officer questioned the passenger through the passenger side window. *Id.* at 1099. Through the window, the officer smelled the "faint odor of burnt marijuana" and ordered the passenger out of the vehicle, subsequently performing a pat-down search that revealed marijuana in the passenger's pants pocket. *Id.* The passenger then informed the officer that he had found a gun and placed it inside the driver's vehicle, the officer discovered the gun under the passenger seat, and the passenger later pled guilty to possession of a firearm by a felon. *Id.*

The Ninth Circuit concluded the parking violation justified the officers' investigatory stop of the vehicle, rejecting the respondent's argument that a parking violation should not be considered a traffic violation that provides probable cause to stop a motorist. *Id.* at 1101–03. The court explained the California Vehicle Code authorized municipalities to establish parking enforcement agencies and contract with public and private agencies to process parking citations, and California law also authorized police to enforce parking violations. *Id.* at 1101. It elaborated that the California rules governing parking regulations and the provisions granting local authorities the power to establish parking restrictions were contained in the same division of the Vehicle Code as moving violations. *Id.* at 1103. Accordingly, the court reasoned, "so long as [the officers] had

reasonable suspicion to believe that [the driver] 'violated the traffic code,' the stop was 'reasonable under the Fourth Amendment [and] the evidence thereby discovered admissible.' " *Id.* at 1102 (final alteration in original) (quoting *Whren,* 517 U.S. at 819, 116 S. Ct. at 1777).

Numerous other courts that have addressed this issue under comparable circumstances have also concluded police have at least reasonable suspicion to stop a motorist after witnessing the motorist commit a parking violation.[5]  For instance, in *Davis v. City of Albia,* the

---

[5]*See, e.g.*, *Davis v. City of Albia*, 434 F. Supp. 2d 692, 702–05 (S.D. Iowa 2006) (concluding an officer had probable cause to make a warrantless arrest of the defendant after witnessing the defendant commit a misdemeanor parking offense); *Fullenwilder v. State*, 946 So. 2d 899, 903 (Ala. Crim. App. 2006) (concluding officer had reasonable suspicion to authorize a warrantless investigatory stop of the defendant based in part on the defendant's parking violation); *People v. Bennett*, 128 Cal. Rptr. 3d 595, 603 (Ct. App. 2011) (holding officer's seizure of the defendant was reasonable to enforce the defendant's parking violation); *State v. Arevalo*, 112 So. 3d 529, 531–32 (Fla. Dist. Ct. App. 2013) ("The deputy observed appellee park in a grassy area marked with 'do not park' signs, which provided the deputy with probable cause to conduct a traffic stop."); *Haynes v. State*, 937 N.E.2d 1248, 1251–52 (Ind. Ct. App. 2010) ("Because Officer McCollum had probable cause to believe Haynes had committed [a parking] infraction,  his detention of Haynes was reasonable and did not violate either the state or federal constitutions."); *State v. Gross*, 184 P.3d 978, 987–88 (Kan. Ct. App. 2008) (concluding officers had reasonable suspicion that driver parked illegally, thereby justifying the officers' brief detention of the driver to issue him a ticket for the parking violation); *Back v. Commonwealth*, No. 2019–CA–000591–MR, No. 2019–CA–000601–MR, 2020 WL 2095894, at *2 (Ky. Ct. App. May 1, 2020) (acknowledging probable cause supported traffic stop of defendant to enforce a parking violation); *State v. Hardeman*, 906 So. 2d 616, 621–22 (La. Ct. App. 2005) (holding officer had probable cause to stop the defendant's car based on a traffic violation); *Herring v. State*, 16 A.3d 246, 254–55 (Md. Ct. Spec. App. 2011) (holding probable cause justified an officer's seizure of the defendant for a parking violation); *People v. Ingram*, 312 N.W.2d 652, 654 (Mich. 1981) (per curiam) ("Having ascertained that the defendant was the owner of the [illegally-parked] car, the officer requested his driver's license so that the parking citation could be issued to him. Given the compliance with this request, and the response to the officer's questions, the seizure of the weapon and the arrest of the defendant were not constitutionally impermissible." (footnote omitted)); *State v. Milton*, No. A–16–289, 2017 WL 582715, at *4 (Neb. Ct. App. Feb. 14, 2017) (holding officer's observation of a parking violation "g[ave] rise to probable cause to initiate a stop of the vehicle"); *People v. Morgan*, 781 N.Y.S.2d 652, 653 (App. Div. 2004) (concluding it was valid for police to stop defendant's car based on a parking violation); *State v. Hawley*, 540 N.W.2d 390, 393 (N.D. 1995) (holding officer had reasonable suspicion to make investigative stop because "a reasonable person [would] suspect that [defendant's vehicle] may be illegally parked"); *Eason*, 69 N.E.3d at 1209–11 (concluding an officer's observation of defendant's parking violation "served as a lawful basis to stop the vehicle"); *State v. Hall*, 241 P.3d 757, 758–59 (Or. Ct. App. 2010)

United States District Court for the Southern District of Iowa upheld the officer's warrantless arrest of an individual who the officer observed parking illegally in a persons with disabilities parking space. 434 F. Supp. 2d 692, 702–05 (S.D. Iowa 2006). The court explained the officer could conduct "a warrantless arrest of [the driver] without violating either Iowa law or the Fourth Amendment" because the officer witnessed the defendant "commit[] the misdemeanor public offense of improper use of a persons with disabilities parking permit." *Id.* at 703. The court further recognized "an officer may lawfully require the driver of a vehicle already stopped to remain outside the vehicle during the brief period of detention required to issue a citation." *Id.* at 704. In doing so, it rejected a claim similar to Warren's that the officer did not have to detain the driver because the officer could have filed the parking citation with the court "as in cases where the driver is not present" instead. *Id.* at 705.

Here, as in *Choudhry* and *Davis*, Warren committed a traffic violation that the Iowa Code authorizes police to enforce. Specifically, her parking violation constitutes a simple misdemeanor criminal offense that Officer Engle was authorized by law to arrest Warren for committing in his presence in lieu of issuing a citation. *See* Iowa Code § 321.482; *id.* at § 804.7(1) (authorizing a peace officer to arrest an individual for

---

(concluding police stop of defendant's vehicle was justified because they had probable cause to believe defendant committed a parking violation); *Commonwealth. v. Bozeman*, 205 A.3d 1264, 1273–74 (Pa. Super. Ct. 2019) (finding police had probable cause to stop defendant's motor vehicle after observing the defendant's parking violation); *State v. Zelek*, No. M2007–01776–CCA–R3–CD, 2009 WL 890904, at *6–7 (Tenn. Crim. App. Apr. 3, 2009) ("[T]he officer had probable cause that a parking violation had occurred and could make a constitutional stop of the car."); *Williams v. State*, 726 S.W.2d 99, 100–01 (Tex. Crim. App. 1986) (en banc) (holding probable cause to arrest the defendant for a parking violation justified the warrantless search of the defendant's vehicle incident to arrest); *State v. Iverson*, 871 N.W.2d 661, 674–75 (Wis. 2015) (holding an officer may conduct an investigatory stop of a vehicle based on reasonable suspicion of a nontraffic civil forfeiture offense).

committing or attempting "a public offense . . . in the peace officer's presence)"; *see also id.* at § 701.2 ("A public offense is that which is prohibited by statute and is punishable by fine or imprisonment."). That Officer Engle had the discretion to leave Warren a written citation on the vehicle's windshield instead of stopping her to enforce her parking violation does not render his decision to briefly seize her unconstitutional. *Cf. State v. Orozco*, 573 N.W.2d 22, 24–25 (Iowa 1997) (en banc) (per curiam) (holding a statute allowing for the release or arrest of a defendant after being issued a citation for a traffic violation did not "negate[] the [officer's] authority to arrest for a public offense" committed in the officer's presence).

Further, similar to *Choudhry*, Warren's violation of Iowa Code section 321.358 for parking illegally is contained in the same Code chapter—entitled "Motor Vehicles and the Law of the Road"—that covers moving violations, which also includes laws governing such matters as reckless driving, eluding, and speed restrictions. *See generally* Iowa Code chapter 321; *see also Choudhry*, 461 F.3d at 1103 (declining to distinguish between parking and moving violations for constitutional purposes partly because the California Vehicle Code treated parking regulations as part of its general traffic laws); *Copeland*, 321 F.3d at 594 (declining to distinguish between parking and moving violations for constitutional purposes partly because the parking violation at issue was "set forth under the general traffic laws of the Michigan Vehicle Code"). Had the legislature intended to treat parking violations different from other traffic violations for purposes of enforcement, it could have distinguished them accordingly. That it declined to do so speaks to its intent to treat parking and moving violations in the same manner. *See State v. Iowa Dist. Ct.*, 730 N.W.2d 677, 679 (Iowa 2007) ("When a proposed interpretation of a statute would

require the court to 'read something into the law that is not apparent from the words chosen by the legislature,' the court will reject it." (quoting *State v. Guzman-Juarez*, 591 N.W.2d 1, 2 (Iowa 1999))). Ultimately, Warren's contention that the seizure was unconstitutional because Officer Engle exercised his lawful discretion to briefly seize and investigate her about the parking violation instead of leaving a written ticket boils down to a policy disagreement with the legislature's decision to designate her parking conduct as an enforceable offense. But "it is our job to interpret the Iowa Constitution and not to set policy for the State of Iowa." *Brown*, 930 N.W.2d at 849.

Just as the Supreme Court in *Whren* declined to distinguish different types of traffic violations that would prevent certain violations in themselves from serving as "the ordinary measure of the lawfulness of enforcement," we reject Warren's request to distinguish between different moving and parking violations for constitutional purposes. 517 U.S. at 818, 116 S. Ct. at 1777. Because Officer Engle witnessed Warren commit a traffic violation by parking illegally, he had probable cause to stop Warren to enforce that violation. Thus, the seizure was constitutional under the Fourth Amendment of the United States Constitution and article I, section 8 of the Iowa Constitution, and Warren's counsel was not ineffective for declining to file a meritless motion to suppress on this ground.

2. *The scope of the seizure.* Warren argues that, even if probable cause existed to stop her to enforce her parking violation, the stop exceeded constitutional bounds when Officer Engle asked Warren for her license, registration, and insurance information because he could have enforced Warren's parking violation by placing a citation on the vehicle. If asking Warren to produce this information did not unlawfully exceed the

scope of the seizure, Warren further maintains Officer Engle's inquiry of Warren about her activities that night exceeded the scope. We disagree.

As we have already explained, Officer Engle had probable cause to seize Warren to enforce the parking violation he witnessed her commit. "Once lawfully stopped, inquiries reasonably related to the mission of addressing the traffic infraction 'and attend[ing] to related safety concerns' are permissible." *State v. Salcedo*, 935 N.W.2d 572, 578 (Iowa 2019) (alteration in original) (quoting *Rodriguez v. United States*, 575 U.S. 348, 354, 135 S. Ct. 1609, 1614 (2015)). These inquiries reasonably include "asking for the driver's license and registration." *Id.* (quoting *State v. Aderholdt*, 545 N.W.2d 559, 563–64 (Iowa 1996)); *see also Rodriguez*, 575 U.S. at 355, 135 S. Ct. at 1615 ("Typically such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance."). "These checks serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly." *Rodriguez*, 575 U.S. at 355, 135 S. Ct. at 1615. Ultimately, the stop may "last no longer than is necessary to effectuate" its purpose of addressing the traffic infraction. *Id.* at 354, 135 S. Ct. at 1614.

Here, the purpose of Officer Engle's stop was to address Warren's parking violation. As we have held time and again, "when there is a valid ongoing traffic stop[,] officers may properly seek driver's identification, registration, and insurance information" as Officer Engle did in this case. *State v. Coleman*, 890 N.W.2d 284, 299 (Iowa 2017). Warren's claim that Officer Engle impermissibly extended the stop by asking for Warren's license, registration, and insurance information because he could have enforced Warren's violation "by way of a citation placed on the vehicle" overlooks Officer Engle's need to at least identify the person he witnessed

commit the parking violation. This is especially so given Warren's parking violation places the liability on the vehicle's driver at the time of the offense, who could differ from the vehicle's registered owner. *See* Iowa Code § 321.358. Even if the owner of the vehicle and the driver are the same individual, the officer is typically not aware of this fact without inquiring into the driver's identity. Under these circumstances, Officer Engle's initial request for Warren's license, registration, and insurance information was permissible because it was "reasonably related to the mission of addressing the traffic infraction 'and attend[ing] to related safety concerns.'" *Salcedo*, 935 N.W.2d at 578 (Iowa 2019) (alteration in original) (quoting *Rodriguez*, 575 U.S. at 354, 135 S. Ct. at 1614 (2015)). Therefore, Warren's counsel was not ineffective for declining to file a motion to suppress on this ground.

Moreover, Officer Engle did not unlawfully exceed the scope of the seizure by asking Warren for her registration and insurance information or about her activities that night after Warren provided only her identification. Although Officer Engle had already obtained the identifying information he needed at that point to enforce Warren's parking violation, law enforcement may expand a reasonable investigation "to satisfy suspicions of criminal activity unrelated to the traffic infraction based upon responses to reasonable inquiries." *Id.* To do so, "the officer must identify 'specific and articulable facts which, taken together with rational inferences from those facts,' amount to reasonable suspicion that further investigation is warranted." *Id.* (quoting *United States v. Murillo-Salgado*, 854 F.3d 407, 415 (8th Cir. 2017), *cert. denied*, 138 S. Ct. 245 (2017)). We consider all of the circumstances before the officer at the time of the stop to determine whether the officer had reasonable suspicion to expand the investigation beyond the traffic stop's mission. *Id.*

In this case, Officer Engle was quickly confronted with circumstances amounting to reasonable suspicion that warranted further investigation. When Warren gave Officer Engle her identification, she informed him her license was suspended. This provided Officer Engle with reasonable suspicion of an additional violation—driving while license is suspended—before he had resolved the original purpose of the stop to enforce Warren's parking violation. "[D]rivers without licenses are presumably the less safe drivers whose propensities may well exhibit themselves." *Delaware v. Prouse*, 440 U.S. 648, 659, 99 S. Ct. 1391, 1399 (1979). Officer Engle was reasonably "attend[ing] to related safety concerns" when he asked Warren for her registration and insurance information as part of his investigation, so he did not impermissibly extend the scope of the seizure simply by asking for these documents after Warren had already provided her identification. *Salcedo*, 935 N.W.2d at 578 (alteration in original) (quoting *Rodriguez*, 575 U.S. at 355, 135 S. Ct. at 1614).

Nor did Officer Engle impermissibly extend the scope of the seizure by asking Warren about her activities that night. Officer Engle had reasonable suspicion that Warren was driving while intoxicated almost immediately upon seizing her. We have previously held the odor of marijuana drifting from a vehicle provides probable cause to search the vehicle, so it logically follows that the same circumstances provide reasonable suspicion to continue a valid ongoing traffic stop. *See State v. Eubanks*, 355 N.W.2d 57, 59 (Iowa 1984) ("The patrolman smelled the odor of marijuana drifting from the car when he approached defendant, who was seated behind the steering wheel. The odor of that controlled substance in the automobile gave the patrolman reasonable cause to conduct a comprehensive search of the car.").

Officer Engle testified that he "smelled a strong odor of marijuana emitting from [Warren's] vehicle" when Warren opened her car door to retrieve the requested documents. Officer Engle also noticed Warren had bloodshot, watery eyes and droopy eyelids, and he could smell "a faint odor of alcohol" on Warren. Officer Engle's suspicions were confirmed when Warren herself exclaimed, "Ooh, it does smell like weed," when she opened the door. These observations occurred while Officer Engle was still effectuating the purpose of the original stop to enforce Warren's traffic infraction and provided Officer Engle with "reasonable suspicion that further investigation [was] warranted." *Salcedo,* 935 N.W.2d at 578 (quoting *Murillo-Salgado,* 854 F.3d at 415). Consequently, Officer Engle's seizure was constitutional, and Warren's counsel was not ineffective for choosing not to file a motion to suppress on this ground.

The special concurrence and dissent raise important issues, but those issues are not before us to decide in this case because they were not raised or briefed by the parties. Though Warren raises a concern in her application for further review about the impact that the lack of distinction between parking and moving violations may have on racial profiling, she does not allege that the police engaged in racial discrimination or racial profiling, that the police stopped her due to implicit bias, or that the stop in this case was pretextual. "We generally will not consider issues raised for the first time in a reply brief in an appeal, let alone in an application for further review," *State v. Shackford,* 952 N.W.2d 141, 147–48 (Iowa 2020), and the words race, discrimination, bias, and pretext do not even appear in her briefs.

In summary, Officer Engle had probable cause to seize Warren to enforce her parking violation and did not exceed the scope of his seizure by asking for her license to enforce that violation. Likewise, Officer Engle

had reasonable suspicion of other criminal activity to justify expanding his investigation based on Warren's suspended license, the smell of marijuana, Warren's signs of intoxication, and Warren's admissions. Under these circumstances, Warren's trial counsel was not ineffective in choosing not to pursue a meritless motion to suppress, so we affirm her conviction for driving while revoked.

## IV. Conclusion.

We vacate the part of the court of appeals decision reversing Warren's OWI conviction and remanding the matter for a new trial on that count. We otherwise affirm the decision of the court of appeals and the judgment of the district court.

**DECISION OF COURT OF APPEALS AFFIRMED IN PART AND VACATED IN PART; DISTRICT COURT JUDGMENT AFFIRMED.**

McDonald, Oxley, and McDermott, JJ., join this opinion. Mansfield, J., files a special concurrence. Appel, J., files a dissenting opinion. Waterman, J., takes no part.

#19–0267, *State v. Warren*

**MANSFIELD, Justice (specially concurring).**

I am beginning to wonder if law school academics have it backwards. Maybe the problem is not the pretextual stop; it's the stop without another stated motive. When the police detain someone over a minor, seemingly trivial offense because they are investigating a more serious crime, that is a traditional, often necessary method of law enforcement. But when police take an action they would not normally take in response to something minor, and they don't argue it was pretextual, we ought to be more concerned. That's clearly a situation where implicit bias and discriminatory assumptions can take over.

This case may illustrate that point, although it is difficult to draw firm conclusions because no motion to suppress was filed below.

Officer Engle wasn't investigating anything in particular when he and a fellow officer stopped their respective patrol cars on Corning Avenue and detained Jasmaine Warren. Officer Engle didn't suspect Warren of committing some other offense. Still, he detained her over a violation that normally would have been handled with a piece of paper on a windshield. Here are the facts as related by Officer Engle himself in his police report:

> While traveling northbound on 6th Ave, I observed a silver car drive from the east and turn southbound onto 6th Ave. It appeared the vehicle was accelerating very quickly, which my in-car radar also indicated. I turned around on the vehicle, and I observed it turning eastbound onto Corning Ave. I observed the vehicle partially pull into a driveway and park. There were signs indicating there was no parking on the south side of Corning Ave at that location. A substantial portion of her vehicle was in the roadway. The defendant exited the vehicle and proceeded to walk to the house. I made contact with the defendant and advised her she could not park her vehicle like that. I then asked her for her license, registration, and proof of insurance. The defendant stated it was in her vehicle and she walked over to it and opened the door. I could smell a strong odor of marijuana emitting from the vehicle.

What's missing from this narrative is the why. Why did Officer Engle follow this motorist and, after she parked, why did he detain her?

Critics of the United States Supreme Court's unanimous decision in *Whren v. United States*, 517 U.S. 806, 116 S. Ct. 1769 (1996), and our decision in *State v. Brown*, 930 N.W.2d 840 (Iowa 2019), argue that any separation between the legal reason for the stop and the real reason for the stop should render the stop invalid. *See Brown*, 930 N.W.2d at 871 (Appel, J., dissenting). They would argue that evidence obtained from detaining Warren should be suppressed if the police's real motive for detaining her wasn't her irregular parking. If the police weren't really concerned with the fact that the rear of her vehicle was sticking out into Corning Avenue, their actions were unconstitutional. Again, any disconnect between the legal basis for the stop and the actual reason for the stop would render the stop unlawful.

Implicit bias and discriminatory assumptions are not issues that should be swept away, disregarded, or merely brushed to the side. They deserve to be tackled head-on. On this point I fully agree with the *Whren* critics. And I find the following, broad definition of racial profiling helpful:

> Police engage in racial profiling when they select persons of a specific race for attention because they assume that those persons are more likely to commit or have committed a targeted crime or crime generally than a White or other majority person.

Jeffrey Fagan & Amanda Geller, *Profiling and Consent: Stops, Searches, and Seizures After* Soto, 27 Va. J. Soc. Pol'y & L. 16, 31 (2020).

Yet I'd consider a different approach than many of the critics advocate. For one thing, pretextual enforcement of the law is sometimes necessary. Pursuing lesser but easier to prove offenses is a tried-and-true strategy for tackling more serious crimes that would otherwise remain

unsolved. Not surprisingly, pretextual law enforcement has been valuable in catching very powerful criminals who might have the resources and allies to thwart the government. Pretextual law enforcement isn't always the enemy of the poor and the friend of the elite.

At the same time, in a trial about purpose and intent, allegations of racially motivated traffic stops at times receive "cold shoulder" treatment. Courtroom discussions about race are uncomfortable and less than candid, leaving race to fill the role of being the elephant in the room. *See* Sherri Lee Keene, *Raising Arguments About the Potential Influence of Implicit Racial Bias in Police Stops*, 32 Crim. Just. 35, 35 (2017). This makes proving racial bias very challenging.

Let me mention one case that illustrates the difficulties the justice system sometimes has in dealing with issues of race head-on. It involves our own court. Eight years ago, in *State v. Tyler*, 830 N.W.2d 288 (Iowa 2013), we reversed the conviction of a Black man driving an Escalade at night in a suburb of Des Moines who had been pulled over for having a tinted license plate cover. Consistent with the manner in which the attorneys had briefed and argued the case, our opinion treated the constitutional question antiseptically and race was never mentioned. Yet the case had racial profiling implications. *See, e.g., RIGHTS VIOLATED: Retrial for Convicted Drunk Driver*, WHO 13 (April 30, 2013, 10:27 PM), who13.com/news/retrial-man-convicted-of-owi-gets-retrial-because-rights-violated/ [https://perma.cc/KE49-Y4AB].

So pretextual stops themselves aren't necessarily the problem, and making them unlawful isn't necessarily the solution. Rather, I believe a greater dilemma arises when, as here, the official reason for the stop is the *only* apparent reason. In my view, it would be more reassuring in a case like this if the police could give another, actual reason for the stop.

Exposing the pretext, if there is one, could provide some assurance that the stop was not simply based on stereotyping, racial profiling, or whim.

In other words, in the case of a parking violation—i.e., the type of violation normally handled without a personal interaction between citizen and law enforcement—*I would ask law enforcement to provide their real reason for the detention.*

This also addresses the other major problem with the critique of *Whren* and *Brown.* There are often considerable practical difficulties in determining the actual motive for a stop when the motorist has committed a minor offense. *Brown,* 930 N.W.2d at 848. If the officer insists that the minor offense was the real reason for the stop, how does one prove otherwise without a complicated and sometimes pointless inquiry into state of mind? I believe the answer is not just to shift the burden to law enforcement, but to change the nature of the burden-shifting. That is, instead of the State having to prove the officer did not have a racial motive, the State would have to come forward with a legitimate, substantial nondiscriminatory basis for the officer's actions unrelated to the technical violation. This resembles what actors are sometimes required to do elsewhere in discrimination law.[6]

Thus, the rule of law would work like this: For a parking violation or other violation that is normally processed without a seizure of the person, the burden shifts to law enforcement to provide some substantial reason for the seizure other than the violation itself.

Community caretaking can be one justification. *See, e.g., State v. Coffman,* 914 N.W.2d 240, 244 (Iowa 2018). For example, if the parking

---

[6]In *Brown,* the defendant argued for a different type of burden-shifting test, which we rejected. 930 N.W.2d at 848. There the burden would fall on law enforcement to show a nonpretextual reason for the stop. *Id.* As we explained, this kind of burden-shifting just repackages the intent inquiry; it doesn't supersede it.

violation impedes traffic or threatens safety, the officer can confront the motorist and demand immediate action to move the vehicle.

Also, as I've already suggested, if law enforcement can explain that it was conducting a bona fide investigation of a more serious crime, this may justify detaining the motorist briefly, but no more than is necessary to process the parking violation. Pretext is ok when law enforcement is willing to give an additional reason for the stop.

But this approach still leaves a category of cases where suppression would be granted. Those would be the cases where law enforcement can't provide, or isn't willing to provide, another reason for the stop. In those circumstances, there is no suspicion of specific, serious wrongdoing; there is just heightened interest. Heightened interest too often translates into race-based harassment.

An example of such a case may be *United States v. Johnson*, 874 F.3d 571 (7th Cir. 2017) (en banc). There, as here, police officers in two patrol cars carried out a nighttime stop based on a minor parking violation—in that case, a vehicle parked within fifteen feet of a crosswalk. *Id.* at 572. Reading the Seventh Circuit's opinion, no motive for the stop appears other than the parking violation. *Id.* at 572–75. So this stop would be a problem.

Nevertheless, the present case is in some ways *more* concerning than *Johnson.* In *Johnson*, the vehicle's occupants were still in the vehicle, giving the officer a reason to approach and engage with them in order to deal with the parking violation. *Id.* at 572. But here, Warren had exited her vehicle. Instead of leaving a ticket on top of the car, Officer Engle tracked down Warren—seemingly not the normal way of handling a parking violation.

Adopting the burden-shifting approach that I've outlined requires us, I believe, to acknowledge two points. First, vehicle owners may be held vicariously liable for parking violations they didn't personally commit. *See generally Iowa City v. Nolan*, 239 N.W.2d 102 (Iowa 1976) (en banc); *see also* Des Moines, Iowa, Code of Ordinances § 114-485.01 (2020). Second, vehicles themselves can be held "liable" for parking violations in the sense that those vehicles can be impounded or towed. *See* Des Moines, Iowa, Code of Ordinances § 114-485.11. These two propositions mean that there usually isn't a need for the officer to deal personally with the driver who actually committed the parking violation. Indeed, many of us have experienced this situation personally: the parking-ticket-writer who doesn't engage with us even when we are in the immediate process of walking away from or returning to our illegally parked vehicle.[7]

The topic of race should not be neglected in this case. The strained relationship between law enforcement and minority communities must not go unnoticed. Traditionally police officers have operated under a reactive form of policing. Under this form they rely on the squad car to police urban centers, which contributes to the perception that police departments

---

[7]It is notable that just to the north of us, the Minnesota Supreme Court has restricted seizures of motorists for parking violations:

> A police officer who has probable cause to believe that a person has committed a parking violation can stop the person only if the stop is necessary to enforce the violation, for example, if a person is attempting to drive off with an illegally parked car before the officer can issue the ticket.

*State v. Holmes*, 569 N.W.2d 181, 185 (Minn. 1997) (en banc). The majority finds *State v. Holmes* distinguishable because a parking monitor had already issued a ticket and called for a tow when the police officer arrived who seized the defendant. But the full facts are that the car had seven additional unpaid parking tickets. *Id.* at 182. As a result, the monitor was ordered to call for the tow and had to remain with the car until the tow arrived. *Id.* Before the tow came, the defendant showed up with a friend and got in the vehicle. *Id.* The monitor "felt intimidated" by the defendant and called for police assistance. *Id.* at 183. Considering the overall facts of *Holmes*, it is difficult to say a greater need for a personal encounter existed in this case than in *Holmes*.

constitute an occupying force within communities of color. *See* Anthony C. Thompson, *Stopping the Usual Suspects: Race and the Fourth Amendment*, 74 N.Y.U. L. Rev. 956, 1009 (1999). This reactive form of police interaction within communities of color can fuel adversarial relations with residents of these communities. *Id.* As a result, our court should be cognizant of the deeply rooted mistreatment and prejudice of law enforcement toward the African–American community that has plagued the nation. Given the history between law enforcement and African–Americans, many feel it is practically impossible to prove in court successfully that an officer has abused their authority. There seem to be never-ending hurdles one has to overcome. When claims of abuse arise, they are often easily dismissed, usually resulting in giving the officer the benefit of doubt. An officer's suspicion of illicit activity is enough for a stop, but a defendant's suspicion of racial discrimination is not enough to invalidate a stop. Instead concrete, specific, and direct examples must be used to prove race played a factor. These interactions between police officers and African–Americans bring on trauma from past generations and can even include personal experiences of the individual. Knowing this history creates a constant awareness and urgency for "African Americans [to] walk a path uniquely wrought with peril, where one bad choice— forgiven in others—can spiral in ways non-minorities are much less likely to experience." Alfredo Parrish, *Racial Disparity in Iowa's Criminal Justice System 150 Years After* Clark, 67 Drake L. Rev. 251, 253 (2019).

My ideas are far from original. A published critique of the *Johnson* decision has proposed that detentions for parking violations should be measured against a "reasonable officer" standard: "Would a reasonable officer have made the seizure?" If not, the stop is illegal. Stephen D. Hayden, Note, *"Parking While Black": Pretextual Stops, Racism, Parking,*

*and an Alternative Approach*, 44 S. Ill. U. L.J. 105, 135–36 (2019). This seems to be a similar effort to allow some room for pretext but to put an explanatory burden on law enforcement to get the real reason for the stop out on the table.

Recently, the Massachusetts Supreme Judicial Court adopted a burden-shifting approach for persons allegedly subjected to racially motivated stops. *Commonwealth v. Long*, 152 N.E.3d 725, 731 (Mass. 2020). This allows the defendant to point to specific facts presenting "a reasonable inference that the officer's decision to initiate the stop was motivated by race or another protected class." *Id.* Having done so, the burden shifts to the state to rebut the inference. *Id.* This *Batson*-challenge-to-a-traffic-stop approach wouldn't necessarily ban pretextual stops but would certainly require a substantial race-neutral pretext.

In *Commonwealth v. Long*, two Boston police officers were driving in an unmarked car. *Id.* at 732. While in the unmarked car, the officers noticed a Mercedes being driven by a Black man on a residential street. *Id.* The officers indicated no traffic infraction occurred after initially deciding to follow the vehicle. *Id.* It wasn't until after watching the car pass that the police decided to enter the vehicle's license plate number into their onboard computer. *Id.* Results indicated the vehicle was registered to a Black woman and lacked an inspection sticker, so the police stopped the vehicle. *Id.* After initiating the traffic stop, it was discovered the defendant's license was suspended, he had outstanding warrants, and a subsequent search of the vehicle led to the discovery of a gun. *Id.* The defendant was later charged with several firearm offenses. *Id.*

A motion to suppress evidence from the traffic stop was denied by the trial judge. *Id.* at 733. Both officers testified that they were aware of thefts, vandalism, and shootings in the vicinity, later deciding to tow and

impound what they deemed to be a high-end vehicle, which did not belong to the defendant. *Id.* at 732. During the suppression hearing, the defendant presented testimony from an expert in statistics. *Id.* at 733. The expert presented datasets as evidence to show that the traffic stop was racially motivated. *Id.* The trial court found the defendant did not meet his burden to show a reasonable inference of racial discrimination. *Id.* On interlocutory review, the Supreme Judicial Court reversed, and in so doing, considerably broadened the range of evidence that could be used to establish an inference of racial motivation. *Id.* at 738–40.

*Long* provides a different solution than I am proposing, but it shares the basic notion of shifting the burden to law enforcement to explain the "why." Presently, in Iowa, the burden falls entirely on the defendant to prove that racial profiling occurred. I believe that in order to find a seizure of someone over a parking violation reasonable under article I, section 8, it may be appropriate to require law enforcement to advance a substantial objective justification entirely divorced from racial considerations.

Having said this, the present case comes to us on appeal by way of ineffective assistance. No challenge was raised below to Warren's seizure. Even on appeal, Warren argues only for one thing: a categorical rule that completed parking violations do not justify a seizure under *either* the Fourth Amendment to the United States Constitution *or* article I, section 8 of the Iowa Constitution. Warren makes no effort to distinguish the two constitutional provisions nor any effort to distinguish among parking violations based on the factual circumstances.

I cannot say that trial counsel breached an essential duty here. Yet I encourage counsel to continue to raise issues relating to racial discrimination in the administration of justice, as appellate counsel has done so here. For the foregoing reasons, I concur in the majority opinion

except for its determination that the stop of Warren complied with article I, section 8. On that point, I concur in the judgment.

#19–0267, *State v. Warren*

**APPEL, Justice (dissenting).**

I respectfully dissent.

The question in this case is whether a completed parking violation is a sufficient basis for an intrusive police seizure under the Fourth Amendment of the United States Constitution or article I, section 8 of the Iowa Constitution. It may seem like a minor matter. It is not. Whenever law enforcement is granted broad and virtually unlimited discretion to search and seize, the prospect of arbitrary enforcement necessarily arises.[8]

---

[8]The claim that a minor traffic violation is not a basis for an intrusive seizure was clearly raised in the district court. One of the arguments supporting prohibiting such stops is that it gives rise to arbitrary police action. The argument is that the general authority to make seizures based on minor and widespread violations permits seizures based upon racial profiling and other arbitrary reasons. It is based on the notion that search and seizure law abhors general discretion in the hands of law enforcement. There need not be a specific claim of racial profiling in this case to permit the argument to be made that a general authority to engage in search and seizure may lead to it. I fear that the majority is characterizing an argument as an issue which needs to be preserved. Such restrictions do not seem to apply against the State. *Wagner v. State*, 952 N.W.2d 843, 858 (Iowa 2020) (considering a severance argument and developing a judicial nonstatutory tort claims framework despite the arguments not being raised below).

Apparently, however, under the majority opinion, this case stands for very little. Under the majority approach to preservation, a future party may challenge a seizure for a minor traffic violation on identical facts if the party specifically raises the argument that such a broad-based authority to seizure could give rise to racial profiling. That, of course, is precisely the point made in this dissent. In my view, a prophylactic rule is required to prevent racial profiling and other arbitrary seizures. The defendant is not required to make an actual showing of racial profiling or other arbitrary conduct to support this across the board, prophylactic rule. Apparently, the position advanced in this dissent remains alive for another day if the defendant's lawyer uses the magic words "race, discrimination, bias, and pretext."

A separate argument that I agree was not preserved is whether the erroneous and flawed doctrine announced by the United States Supreme Court in *Whren v. United States* applies to minor traffic violations. 517 U.S. 806, 816–19, 116 S. Ct. 1769, 1776–77 (1996). The United State Supreme Court has not so held, and neither have we. It might be possible, in a future case, to recover some of the ground lost in the majority's decision by rejecting *Whren* in the context of parking violations and permitting a defendant to show that the stop was, in fact, pretextual. Whether such intimations prove to be a mirage remains to be seen.

As Professor Amsterdam noted in his seminal search and seizure work many years ago, avoiding "arbitrary search and seizures" was a central goal. Anthony G. Amsterdam, *Perspectives on the Fourth Amendment*, 58 Minn. L. Rev. 349, 417 (1974). The notion of cabining arbitrary exercise of discretion by government officials is a theme that surfaces repeatedly in search and seizure cases. *See, e.g., Skinner v. Ry. Lab. Execs.*, 489 U.S. 602, 613–14, 109 S. Ct. 1402, 1411 (1989) ("The amendment guarantees the privacy, dignity, and security of persons against certain arbitrary and invasive acts by officers of the Government or those acting at their direction."); *United States v. Martinez-Fuerte*, 428 U.S. 543, 554, 96 S. Ct. 3074, 3081 (1976) ("Limits on search-and-seizure powers . . . prevent arbitrary and oppressive interference by enforcement officials . . . ."); *Camara v. Mun. Ct.*, 387 U.S. 523, 528, 87 S. Ct. 1727, 1730 (1967) ("The Basic purpose of this Amendment, as recognized in countless decisions of this Court, is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials.").

At the outset, a stop by police, even for a parking violation, is intrusive to the sanctity of the individual. Further, stops by police may lead to escalating events with very unsatisfactory results. Among other things, stops can lead to: investigation outside the scope of the original stop; requests for broad "consent search" under circumstances that hardly seem voluntary; and, if the United States Supreme Court precedent were to be followed, a full custodial arrest even if permissible sanctions for the underlying infraction do not include imprisonment.[9] Further, the ubiquity

---

[9]*In Atwater v. City of Lago Vista*, a majority of the United States Supreme Court came to the astonishing conclusion that a person may be arrested and carted off to jail for an offense where the criminal penalty carries no jail time. 532 U.S. 318, 354, 121 S. Ct. 1536, 1557 (2001). This court has never approved the approach of *Atwater*, and the proposition has been subject to scorching academic criticism. *See generally, e.g.,*

of parking violations poses an obvious problem of discriminatory enforcement that is anathema to our constitutional protections against arbitrary search and seizures. *See, e.g.*, Devon W. Carbado, *From Stopping Black People to Killing Black People: The Fourth Amendment Pathways to Police Violence*, 105 Calif. L. Rev. 125, 127–30 (2017); Stephen D. Hayden, Note, *"Parking While Black": Pretextual Stops, Racism, Parking, and an Alternative Approach*, 44 S. Ill. U. L.J 105, 107–09, 133–35 (2019).

In order to understand the issue in full context, it is necessary to fully understand the interaction of three United States Supreme Court cases: *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868 (1968), *Whren v. United States*, 517 U.S. 806, 116 S. Ct. 1769 (1996), and *Atwater v. City of Lago Vista*, 532 U.S. 318, 121 S. Ct. 1536 (2001). When *Terry* and *Whren* operate together, unacceptable results ensue. *Terry* establishes a low standard for seizure for investigative purposes. 392 U.S. at 20–27, 88 S. Ct. at 1879–83. *Whren* permits pretextual use of *Terry* stops even for ubiquitous traffic violations. 517 U.S. at 817–19, 116 S. Ct. at 1776–77. Taken together, they give law enforcement the power to stop virtually any motorist. The sweeping and undisciplined exercise of the discretion created and permitted by *Terry* and *Whren* then combines with *Atwater*, which stunningly permits law enforcement to engage in a full custodial arrest—even if the violation giving rise to the arrest does not have incarceration as a potential sanction. *Atwater*, 532 U.S. at 354, 121 S. Ct. at 1557; *see also* Jason M. Katz, Note, Atwater v. City of Lago Vista*: Buckle-Up or Get Locked-Up: Warrantless Arrests for Fine-Only Misdemeanors Under the Fourth Amendment*, 36 Akron L. Rev. 491, 544 (2003).

---

Barbara C. Salken, *The General Warrant of the Twentieth Century? A Fourth Amendment Solution to Unchecked Discretion to Arrest for Traffic Offenses*, 62 Temp. L. Rev. 221 (1989).

This remarkable broad and consequential government power is highly troublesome in light of recent scholarship on implicit bias. The scholarship demonstrates that all of us carry implicit biases that can impact the manner in which we engage in decisions. *See, e.g.,* Mark W. Bennett, *Unraveling the Gordian Knot of Implicit Bias in Jury Selection: The Problems of Judge-Dominated Voir Dire, the Failed Promise of Batson, and Proposed Solutions,* 4 Harv. L. & Pol'y Rev. 149, 149 (2010). Implicit bias often has a racial dimension. *See* Charles R. Lawrence III, *The Id, the Ego, and Equal Protection: Reckoning with Unconscious Racism,* 39 Stan. L. Rev. 317, 322 (1987). It is no answer to say that the African-American defendant in this case must prove "invidious discrimination" as such a demonstration would be virtually impossible in this case or in any case. *See State v. Brown,* 930 N.W.2d 840, 918–19 (Iowa 2019) (Appel, J., dissenting).

Indeed, when it comes to traffic stops, there is ample evidence that the stops are often pretextual and that race plays a role. Over twenty years ago, David Harris, in influential scholarship, wrote that rules have been relaxed as part of the war on drugs and that African-American and Hispanics pay the largest price. *See* David A. Harris, *Car Wars: The Fourth Amendment's Death on the Highway,* 66 Geo. Wash. L. Rev. 556, 582–85 (1998); David A. Harris, *"Driving While Black" and All Other Traffic Offenses: The Supreme Court and Pretextual Traffic Stops,* 87 J. Crim. L. & Criminology 544, 582 (1997); *see also State v. Pals,* 805 N.W.2d 767, 772–73 nn.4–9 (2011) (reviewing consent orders arising from claims of disproportionate enforcement in traffic stops.).

The nation's leading scholar of criminal law and procedure, Wayne LaFave, has addressed the problem of virtually unlimited government power to seize for ubiquitous minor infractions. 4 Wayne R. LaFave,

*Search and Seizure: A Treatise on the Fourth Amendment* § 9.2(c) (6th ed. Sept. 2020 Update). LaFave suggests that *Terry*-type seizures should be expressly limited to "serious offenses." *Id.* Presumably, LaFave would not classify traffic offenses as "serious offenses." If the LaFave approach were applied by the majority, the officer in this case should have simply issued a citation for the parking violation and left the scene.

There is at least some authority for LaFave's approach in two heartland state courts. In *State v. Holmes*, the Supreme Court of Minnesota considered whether a parking violation can give rise to a stop by police. 569 N.W.2d 181, 184–86 (Minn. 1997) (en banc). The *Holmes* court concluded that a stop may be made only if the stop is necessary to enforce the violation. *Id.* at 185–86. Similarly, in *State v. Medlar*, an Ohio appellate court concluded that where a parking violation had been completed (a truck parked in a fire lane), the violation is complete and there is nothing to investigate. 638 N.E.2d 1105, 1109–10 (Ohio Ct. App. 1994) ("At this point [the officer] should have placed the citation on the vehicle. There was nothing further to investigate.").

The central question, it seems to me, is whether we are going to adopt a bright-line rule regarding stops for parking violations or, instead, engage in a granular, case-by-case analysis of the reasonableness of the seizure. In my view, a bright-line makes the most sense—namely, with respect to completed parking violations, the officer should simply write a citation, place it on the windshield, and move on.

The founders of both the United States Constitution and the Iowa Constitution had a very skeptical view of state power. When it came to state power, they were cynics. They believed that government needed to be restrained by enshrining the Iowa Bill of Rights in the first substantive

article of the Iowa Constitution and through the separation of powers among three branches of government.

In regulating police behavior, the problem in search and seizure law is not primarily a problem of "bad apples" among our police. The problem is one of broad police discretion not subject to discipline or regulation. The founders believed that power corrupts and absolute power corrupts absolutely. Broad unfettered power was anathema to them. That is why they so opposed the hated general warrant and any functional equivalent. *See State v. Ochoa*, 792 N.W.2d 260, 269–75 (Iowa 2010).

In the modern context, if police have broad discretion to enforce (or not enforce) ubiquitous parking violations, the problem of implicit bias, which this court has forthrightly recognized in *Pippen v. State*, 854 N.W.2d 1, 6–7 (Iowa 2014), comes into play. In other words, when police have broad general power to search but are, like all of us, subject to implicit bias, the problem of arbitrary enforcement of search and seizure becomes a systemic problem—not a one-time knockoff. The rule advocated by LaFave and implemented by *Medlar* and *Holmes* mitigates against the systemic arbitrariness from leaking into enforcement of minor parking violations.

Of course, in this case, one gets the very strong sense that the actions of the officers were not motivated by a parking violation. Two squad cars emerged at the driveway of the residence, one with emergency lights engaged. They were not likely racing to the scene to prevent a rash of parking violations that threatened the well-being of Gotham City. The show of force demonstrates that the officers had other hunches, and were using the parking violation as leverage to further expand their investigation and see what it might turn up. *See United States v. Guzman*, 864 F.2d 1512, 1515 (10th Cir. 1988) ("The classic example [of a pretextual

stop] occurs when an officer stops a driver for a minor traffic violation in order to investigate a hunch that the driver is engaged in illegal drug activity."). They had a hunch, used the parking violation as a mechanism to investigate, and achieved their goal.

It is true, unfortunately, that our recent 4–3 decision in *State v. Brown* adopts the Supreme Court approach in *Whren.* 930 N.W.2d at 854. My views were canvassed in my dissent in *Brown* and need not be repeated here. *Id.* at 871–928 (Appel, J., dissenting). But the Supreme Court has never applied *Whren* in the context of a parking violation. Neither have we. But *that* issue has not been squarely addressed in the briefing in this case.

In any event, even better than declining to apply *Whren* to completed parking violations, we should mitigate the problems of discriminatory enforcement and escalation initiated by parking violations by adopting under article I, section 8 of the Iowa Constitution a prophylactic rule that when a parking violation is completed, police officers should simply write a citation, place it on the windshield, and move on. Indeed, the history of criminal procedure in the United States has largely been adoption of a series of generally applicable rules like that in *Gideon v. Wainwright*, 372 U.S. 335, 83 S. Ct. 792 (1963), and *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602 (1966), that are designed to provide prophylactic protection in light of grave injustices to African-Americans in the past. *See generally* Michael J. Klarman, *The Racial Origins of Modern Criminal Procedure*, 99 Mich. L. Rev. 48 (2000) (tracing the roots of modern criminal procedure law derived from injustices against African-Americans in the Jim Crow South).

As Justice Wiggins eloquently observed only a few years ago, the racial disparity in Iowa's prisons is disgraceful. *State v. Williams*, 929

N.W.2d 621, 638 (Iowa 2019) (Wiggins, J., concurring in part and dissenting in part). Justice Wiggins noted that African-Americans make up 3.1% of Iowa's population but 25.8% of Iowa's prison population. *Id.* The fact that Iowa prisons show a very disturbing degree of racial disproportionality suggests there is a need for prophylactic rules to mitigate against arbitrary and disproportionate enforcement of the law. I would provide one in this case.